[No. A022178. First Dist., Div. Four. May 21, 1987.]

SUE ELLEN MAHANNAH, Plaintiff and Appellant, v.
KENNETH R. HIRSCH et al., Defendants and Respondents.

COUNSEL

Thomas W. Wilson and Wilson & Gough for Plaintiff and Appellant.

D. Stuart Candland and Craddick, Candland & Conti for Defendants and Respondents.

OPINION

CHANNELL, J.—Appellant Sue Ellen Mahannah sued for medical negligence. Defendants included Doctors Kenneth R. Hirsch and William S.

Palmer, pathologists at Alta Bates Hospital, as well as Alta Bates and Stanford University Hospitals. After plaintiff rested, each defendant moved for nonsuit and dismissal. The motion by defendants Hirsch and Palmer was granted; the motion by defendant hospitals was denied. A judgment of dismissal was entered in favor of defendants Hirsch and Palmer. Appellant's subsequent motion for a new trial was denied. A timely notice of appeal was filed.

## I.  FACTS

In January 1977, appellant Sue Ellen Mahannah noticed a large lump in her neck. She was examined by Dr. Norman Cohen, an oncologist, who in turn arranged for a biopsy of the lump by Dr. Louis Brizzolara, a general surgeon at Alta Bates Hospital. The results of the biopsy indicated appellant had Hodgkins disease, a tumor of the lymph nodes.

Once a diagnosis of Hodgkins disease is made, it is necessary for treatment purposes to establish the stage of the disease. If left untreated, the disease spreads, involves other lymph nodes, and is always fatal. Doctors classify the disease in four stages, with stage I the least serious and stage IV the most serious and life-threatening. In stages I, II, and III, the disease is restricted to the lymph nodes plus the spleen. In stage IV, the disease progresses from those areas into other organs and parts of the body. To determine the stage, the patient is first evaluated clinically, based on physical examination, history, and nonpathological laboratory data, such as X-rays and blood tests. The patient may also be evaluated pathologically, by the taking of further biopsies from the patient during what is called a staging laparotomy.

On February 2, 1977, a staging laparotomy was performed on appellant at Alta Bates Hospital by Dr. Brizzolara. During surgery, Dr. Brizzolara removed appellant's spleen and took both a needle biopsy and a wedge biopsy of the liver. The surgeon observed that both the spleen and the liver were enlarged.

Tissue samples were sent to the pathology department for evaluation. Dr. Kenneth Hirsch, a pathologist, examined the tissue slides and prepared a report in which he concluded there was liver involvement. With liver involvement, the diagnosis is automatically stage IV Hodgkins disease, and the patient is treated accordingly. A copy of Dr. Hirsch's report was sent to Dr. Brizzolara, the surgeon whose name appeared on the pathology requisi-

tion slip, and another copy was placed in appellant's hospital chart. No copy was sent directly to Dr. Cohen, appellant's primary treatment doctor, although he did see the copy in the hospital charts.

In his report, Dr. Hirsch noted that "Reed-Sternberg" cells, which are clearly diagnostic of Hodgkins disease, were absent, but he concluded nevertheless that there was liver involvement. Dr. Hirsch did not advise either Dr. Cohen or appellant that there were alternative schools of thought among reputable pathologists as to whether Reed-Sternberg cells had to be present in the liver before one could diagnose Hodgkins disease, stage IV, with liver involvement. Dr. Cohen acknowledged that he was aware at that time that there was some disagreement among pathologists on this issue.

When Dr. Cohen informed appellant that she had stage IV Hodgkins disease, she was quite distressed. She knew her prognosis was not as good as it would be if her condition were at a lower stage. He told her that due to the stage IV diagnosis, he had no choice other than to recommend a treatment course of chemotherapy, followed by radiation.

But first, Dr. Cohen, appellant, and her family decided to seek a consultation from Stanford Medical Center, a world center for Hodgkins disease research and treatment, to get a second opinion regarding the diagnosis and treatment. On February 17, 1977, appellant went to Stanford, bringing with her the Alta Bates Hospital records and the pathology slides examined by Dr. Hirsch in reaching his diagnosis of liver involvement.

At Stanford, Dr. Anthony Howes, a radiation therapy resident, reviewed appellant's clinical data, including her personal history, operative report, liver scan, and blood chemistries, together with the Alta Bates pathology reports. He also physically examined appellant. He noted that appellant's liver was twice normal size, and that there was a reference in the operative report to a suspicious abnormality in the right lobe.

Dr. Howes concluded that appellant's disease was at stage IV, and recommended a treatment course of radiation and chemotherapy. He testified that even if appellant were a pathological stage III at that time, "[Stanford's] treatment for her would have been combination radiotherapy followed by MOPP chemotherapy because she was, in fact, a high risk Stage III because of the liver abnormalities or large spleen or extensive spleen involvement." Thus, his treatment recommendation would have been the same whether appellant's condition was stage III or stage IV. He testified that his conclusions represented the collective opinion of the radiation therapy department at Stanford.

Appellant's pathology slides were also reviewed by Dr. Ronald Dorfman, a pathologist in the Stanford Hospital pathology department. In an April 1, 1977, report Dr. Dorfman, disagreeing with Dr. Hirsch and Dr. Howes, concluded there was no Hodgkins disease involvement in appellant's liver. He sent copies of this report to the Stanford radiation therapy department and to Dr. Hirsch at Alta Bates. Dr. Howes did not see the report at that time; otherwise he would have sent a courtesy copy to Dr. Cohen.

Dr. Hirsch received his copy of Dr. Dorfman's report on or about April 7th. He immediately dictated his own supplemental report, commenting on Dr. Dorfman's findings but adhering to his own original diagnosis.[1] This supplemental report was distributed in the same manner as Dr. Hirsch's original report, with copies going into appellant's hospital charts and to Dr. Brizzolara, but none going directly to Dr. Cohen.

Dr. Richard Cohen, (no relation to Dr. Norman Cohen, the treatment doctor), testified as an expert for plaintiff concerning the custom and practice at consulting and teaching hospitals with reference to distributing reports such as that issued by Dr. Dorfman, the Stanford pathologist. He testified that it was customary for a hospital such as Stanford to report any change in the original interpretation to the original consulting doctor. In his opinion, Stanford should also have relayed that information to the original requesting doctor (Dr. Cohen), even if there would have been no change in the treatment program.

There was no testimony that either Dr. Hirsch or Dr. Palmer, the head of the Alta Bates pathology department, had any duty to send a copy of Dr. Hirsch's original and supplemental pathology reports to Dr. Norman Cohen or to appellant.

Meanwhile, on February 22, 1977, before receiving any written reports from Stanford, Dr. Cohen started appellant on a series of six cycles of chemotherapy treatments. Dr. Cohen testified that, at that time, he thought the standard treatment for stage III was radiation treatment alone, while the standard treatment for stage IV was chemotherapy only. There was medical and family testimony concerning the pain and suffering and potential side effects of chemotherapy, both generally and as applied to appellant.

---

[1] In his supplemental report, Dr. Hirsch commented: "Although I would certainly have to agree that Dr. Dorfman has considerably more experience in interpretation of malignant lymphoma. [*sic*] I feel that the lymphoid and reticulum cell aggregates seen within the liver are still at least extremely suspicious of reflecting Hodgkins involvement of that organ."

After appellant completed the six cycles of chemotherapy, Dr. Cohen, in October 1977, referred appellant to Children's Hospital in San Francisco for radiation treatments. One of the doctors there noted Dr. Dorfman's pathology report in appellant's Alta Bates hospital charts. He called Dr. Cohen and advised him for the first time that there might not be any liver involvement.

Dr. Cohen testified that if he had seen Dr. Dorfman's April 1977 report immediately, he would have stopped the chemotherapy after two treatments and would have referred appellant at that time for radiation treatments.

Similarly, appellant testified that had she known about Dr. Dorfman's report, she would not have consented to the chemotherapy treatments, but instead would have accepted stage III radiation therapy. Appellant testified that because she was not made aware either of the significance of the lack of Reed-Sternberg cells in the liver, or of Dr. Dorfman's different diagnosis as to the stage of her disease, she unnecessarily had to endure and suffer the effects of the complete chemotherapy treatment, including its side effects and long-term problems.

## II.  DISCUSSION

### A.  *Standard of Review on Granting of Nonsuit*

At the conclusion of plaintiff's evidence, each defendant moved for a judgment of nonsuit. The motions by Alta Bates and Stanford Hospitals were denied, but the motion made in behalf of Drs. Hirsch and Palmer was granted. The motion made in behalf of the doctors was made "on the ground that there [was] no credible evidence that either of these two doctors violated any legal duty which was a proximate cause of injury to Plaintiff. [¶] Expert testimony would have been required to establish the existence of any such duty and there [was] none whatsoever or at all."

The court granted defendants' motions for nonsuit in the belief that under the circumstances of this case, medical evidence was necessary. This appeal is from the judgment of dismissal thereafter entered.

In considering whether there was error in the granting of the nonsuit, we are guided by the following rules: "A nonsuit may be granted only when, disregarding conflicting evidence and giving to plaintiff's evidence all the

value to which it is legally entitled, indulging in every legitimate inference which may be drawn from that evidence, the result is a determination that there is no evidence of sufficient substantiality to support a verdict in favor of the plaintiff." (*Cervantez* v. *J. C. Penney Co.* (1979) 24 Cal.3d 579, 593 [156 Cal.Rptr. 198, 595 P.2d 975]; *Jones* v. *Ortho Pharmaceutical Corp.* (1985) 163 Cal.App.3d 396, 402 [209 Cal.Rptr. 456].) The rules governing the granting of a nonsuit, however, do not relieve the plaintiff of the burden of establishing the elements of the case. The plaintiff must therefore produce evidence which supports a logical inference in his or her favor and which does more than merely permit speculation or conjecture. If a plaintiff produces no substantial evidence of liability or proximate cause, then the granting of a nonsuit is proper. (*Ibid.*)

## B. *Duty of Disclosure*

### 1. *General*

■ Appellant contends that Dr. Hirsch and the Alta Bates pathology department headed by Dr. Palmer negligently failed to discharge their respective duties of continuing disclosure to her in that: (1) they failed to inform her that other members of the medical profession might render a different diagnosis as to the stage of her disease based on adherence to a contrary school of thought concerning the significance of Reed-Sternberg cells in her liver; and (2) they failed to inform either her or Dr. Cohen, her treatment physician, of the conflicting pathology report that they received from Dr. Dorfman. Appellant further argues that to establish those duties, she did not need to rely on expert testimony. After indicating its intent to grant respondents' motion, the trial court offered appellant the opportunity to reopen her case to present additional evidence, but she chose not to do so.

Respondents argue that, absent expert testimony to the contrary, they had no duty to disclose any information directly to appellant or to Dr. Cohen. The customary duty of pathologists, they contend, is to disclose information they obtain from their pathological analysis directly to the physician who refers a tissue specimen to them for analysis, who in this case was Dr. Brizzolara. We agree, and therefore affirm the judgment of dismissal.

In *Jamison* v. *Lindsay* (1980) 108 Cal.App.3d 223 [166 Cal.Rptr. 443], this division held that: "When surgery or other dangerous therapeutic procedures are being considered, the *therapist* must inform the patient of the available alternatives and the hazards involved so that the patient is able to give effective consent to the proposed treatment." (*Id.,* at p. 230, italics added.)

In *Jamison,* we were applying *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1], in which our Supreme Court held that "as an integral part of the physician's overall obligation to the patient there is a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each." (*Id.,* at p. 243.) When a given procedure inherently involves a known risk of death or serious bodily harm, "a medical doctor has a duty to disclose to his patient the potential of death or serious harm, and to explain in lay terms the complications that might possibly occur. Beyond the foregoing minimal disclosure, a doctor must also reveal to his patient such additional information as a skilled practitioner of good standing would provide under similar circumstances." (*Id.,* at pp. 244-245.) "Whether such additional information should be revealed is properly a matter for expert testimony." (*Jamison* v. *Lindsay, supra,* 108 Cal.App.3d 223, 232; *Morgenroth* v. *Pacific Medical Center, Inc.* (1976) 54 Cal.App.3d 521, 534-535 [126 Cal.Rptr. 681].)

In this case, the record is clear that it was Dr. Cohen, an oncologist, who was appellant's primary attending physician throughout the time period in issue. Concerning necessary surgical procedures, including postoperative care, Dr. Brizzolara shared joint responsibility with Dr. Cohen for managing the patient's care. In *Jamison,* we suggested that an appropriate jury instruction in that case would have been: " 'it is the duty of a physician or surgeon to disclose to the patient all relevant information to enable the patient to make an informed decision whether to seek additional treatment following surgery.' " (*Jamison* v. *Lindsay, supra,* 108 Cal.App.3d at p. 231.) Applying that language to this case, the duty to disclose such information to appellant in their respective areas of responsibility rested with Drs. Cohen and Brizzolara.

In contrast, there was no evidence that Dr. Hirsch or any other pathologist, either at Alta Bates Hospital or at Stanford Hospital, ever had any direct contact with appellant. The pathologist's customary role is to analyze abnormalities and diseases of human tissues by reviewing and interpreting tissue specimens submitted for analysis by other physicians. At Alta Bates Hospital, four pathologists evaluate approximately 1,000 cases each month. In a consulting role, the pathologist prepares a report of his evaluation which is sent to the referring surgeon—here Dr. Brizzolara—and to the patient's hospital charts.[2] To impose a duty on a consulting pathologist to communicate with the patient regarding his evaluations would create an undue burden

---

[2]This situation is not unique to a hospital pathology department. During a patient's hospitalization, the attending physician may request X-rays or laboratory analyses of blood, urine, or other body fluids. These test results, too, would be transmitted to the referring physicians, rather than to the patient.

on the pathologist and could also be disruptive of the primary physician's relation with his patients.

### 2. *Other Schools of Thought*

Dr. Cohen saw the copy of the pathology report in the hospital charts. Although he could not recall the specifics in this particular case, Dr. Cohen testified it was his usual practice to discuss the pathological findings with the pathologist shortly after the evaluation is completed. He acknowledged an awareness when he reviewed the report in 1977 that there was a disagreement among pathologists as to whether Reed-Sternberg cells had to be present in the liver in order to confirm a diagnosis of Hodgkins disease with liver involvement. To the extent Dr. Cohen lacked more specific knowledge concerning these disagreements, he was in a position to discuss this with Dr. Hirsch and, in turn, to transmit pertinent information on to his patient.

### 3. *Dr. Dorfman's Report*

Similarly, when Dr. Hirsch received what he thought was a courtesy copy of Dr. Dorfman's report, he prepared his supplementary report, a copy of which he instructed to be sent to "the doctor on the case." Copies of the supplemental report were sent to the original requesting surgeon, Dr. Brizzolara, and to the hospital charts.

There was testimony by Dr. Richard Cohen and hospital staff people, concerning both the custom and practice as well as the actual procedures used for distributing reports within the hospitals and to outside doctors. Significantly, the trial court denied the hospitals' motions for nonsuit. As for the pathologist, having had a copy of his supplemental evaluation transmitted to the physician who requested his original report and to the hospital charts, there seems no reason, absent expert testimony to the contrary, for this court to impose a duty on pathologists to communicate their findings directly to the patient.

In *Jamison, supra,* 108 Cal.App.3d 223, we did not intend to impose such a duty, as appellant now contends. In that case, Dr. Hanford, the plaintiff's treatment doctor, also performed the surgery. He sent a tissue growth to Dr. Lindsay, the pathologist, who concluded it was benign. Dr. Lindsay knew that there were divergent opinions among pathologists as to whether such tissues were potentially malignant, but he did not so inform Dr. Hanford, the requesting physician. Dr. Hanford in turn told his patient that her tumor was benign. It was later determined that the tumor may in fact have been malignant at the time of the original surgery, and that had chemotherapy

been given at the time, it would have prevented the development of Ms. Jamison's tumor. While we did say there was a duty to disclose conflicting opinions, this could have been accomplished by conveying that information to Dr. Hanford, the primary treatment doctor, who in turn could convey that information to his patient.

The judgment is affirmed.

Anderson, P. J., and Poché, J., concurred.