[No. D007920. Fourth Dist., Div. One. Feb. 26, 1990.]

SANDRA L. TOWNSEND, Plaintiff and Appellant, v. ROBERT L. TURK, Defendant and Respondent.

**COUNSEL**

Daniel T. Broderick III, Kathleen Cuffaro and Robert F. Vaage for Plaintiff and Appellant.

Ault, Deuprey, Jones, Danielsen & Gorman and David J. Danielsen for Defendant and Respondent.

## OPINION

**HUFFMAN, J.**—Sandra L. Townsend appeals the judgment entered on a defense verdict in her action for medical malpractice against radiologist Robert L. Turk, M.D., that alleged theories of negligence and lack of informed consent. She contends the trial court erred in refusing to instruct the jury on informed consent and in granting a nonsuit on her cause of action on that theory. We find no error under the circumstances of this case, where the defendant is a consultant radiologist rather than a clinician or therapist, and affirm the judgment.

■ ■ ■ ■ ■ FACTUAL AND PROCEDURAL BACKGROUND[1]

Townsend was piloting an ultralight aircraft when the craft fell out of the sky and she was injured. Paramedics delivered her to the emergency room at El Cajon Valley Hospital, where she complained of back pain and was seen by emergency room physician Dr. Witkin.[2] Dr. Witkin examined her for neurological and other injury, finding back tenderness, and ordered X-rays, including a series of six films of her lumbar spine.

Dr. Witkin asked Dr. Turk, a radiologist, to look at the X-rays. Dr. Turk was given the impression by hospital staff that Townsend had been in an automobile accident. He found the films showed a mild compression fracture, linear fractures indicating significant trauma, and an irregular anterior (front) margin of the L-5 vertebrae. He reported the same to Dr. Witkin. He could not tell and thus did not report whether any posterior elements of the vertebrae were involved in the fracture to endanger nerve roots, and could not tell without further tests if the fracture were unstable and thus susceptible to aggravation of the injury through movement or otherwise. He did not recommend any further tests be performed.

At trial, Dr. Turk testified he felt his report was adequate to alert Dr. Witkin that Townsend might have a fracture involving her posterior

---

[1] We state the facts in light of the rule that in determining whether a refusal to instruct the jury as requested is erroneous, the reviewing court must examine the evidence in the light most favorable to the appellant. (*Ng* v. *Hudson* (1977) 75 Cal.App.3d 250, 254 [142 Cal.Rptr. 69].) Moreover, in reviewing this judgment after nonsuit, we must give plaintiff's evidence all the value to which it is legally entitled and draw every available legitimate inference while disregarding conflicting evidence. If then there is no sufficiently substantial evidence to support a plaintiff's verdict, we should affirm the judgment of nonsuit. (*Mahannah* v. *Hirsch* (1987) 191 Cal.App.3d 1520, 1525-1526 [237 Cal.Rptr. 140].)

[2] Although Townsend originally sued the hospital and Dr. Witkin, as well as her regular doctor, Sandra Jassman, the only defendant left at the time of trial was Dr. Turk. We have taken judicial notice of those dismissals in the superior court file. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

vertebral body and that more than a simple compression fracture was involved. He never told Dr. Witkin he could rule out posterior damage to the vertebrae and did not feel the standard of care in his practice required him to render such advice. If his report had included every conceivable unlikely interpretation possible from the films, the report would have been overlong and could possibly have dictated to the treating clinician that he had to order further tests, such as a CT scan,[3] to investigate any such possible damage. Dr. Turk did not feel it would be completely ethical to make such a report and force the clinician into a position with which he might not agree, and it might have the appearance of seeking to increase the radiologist's business.

Since Dr. Turk never examined Townsend, he felt he had to defer to the clinician's judgments, although he knew his report interpreting the X-rays would be relied on by the clinician. It was his view that it was the clinician's role to examine the patient and decide accordingly on the use of the various methods of diagnostic studies that are available.

Dr. Witkin sent Townsend home from the emergency room after her three-hour visit there, since he found no significant neurological damage and interpreted Dr. Turk's report as showing no evidence of posterior element vertebral damage. After two days at home, Townsend returned to the hospital and was admitted due to severe back pain and loss of mobility. She was permitted to move around at the hospital until she suffered burning pains shooting down her leg and across her back, causing her to collapse. She was then immobilized and a CT scan was performed six days after her injury, revealing damage to the posterior elements of the vertebrae. Back surgery to remove bone fragments that were impinging on the nerve roots followed four days later. She remained hospitalized for one and one-half months and suffered a number of ill effects after the surgery.

Townsend sued Dr. Turk and others for medical malpractice in a complaint pleading two causes of action, negligence and lack of informed consent. The latter claim alleged Dr. Turk had failed to disclose sufficient information to enable her to make an informed decision regarding the treatment proposed for her.

Townsend's case at her jury trial included her own testimony, stating she would have had a CT scan if she had been told it could reveal any injury, and Dr. Turk's testimony as an adverse witness. She also offered testimony

---

[3] "CT scan" stands for "computerized tomography," a radiological diagnostic technique which allows very detailed study of body parts and injuries.

by an expert diagnostic radiologist, Dr. Weissberg, who stated Dr. Turk's reading of the films and his report were inadequate and did not meet the applicable standard of care because they did not communicate the severity of the injury to the treating clinician who would thus be enabled to correctly decide what to do next. In Dr. Weissberg's opinion, a competent radiologist had the duty in this situation to recommend the possibility that a CT scan be performed. However, the radiologist was not obligated to discuss the patient's clinical condition with the doctor personally before making any recommendations and did not need to tell the clinician what to look for in evaluating a back injury. As an expert radiologist, Dr. Weissberg did not feel qualified to pass judgment on the clinical decisions made by the emergency room physician about what evaluations needed to be done about potential nerve damage.

Dr. Witkin, the emergency room doctor, testified that he relied on the radiologist, Dr. Turk, to interpret the X-rays for him, and that if he had been told the films were not enough to determine if the posterior elements of the vertebrae were affected, he would have followed up with further consultations with the radiologist or a neurosurgeon. He would not have considered it an intrusion for Dr. Turk to suggest a CT scan be performed.

In addition to Dr. Turk's testimony, the defense presented two experts. Dr. Saldino, a radiologist, stated Dr. Turk's reading of the films as showing a compression fracture was within the standard of care, although in hindsight Dr. Saldino could see the possibility of a "burst fracture" (caused by a squashing type of trauma) present. Where positive neurological findings are made in the clinical examination of a patient, Dr. Saldino would expect an emergency room doctor to know that either a CT scan or consultation with a neurosurgeon or an orthopedist would be in order. However, if the radiologist were told of particularly severe neurological findings or trauma of an unusual nature, the radiologist might need to indicate to the clinician that additional work-up or further evaluation was needed in the form of a CT scan or additional films. Dr. Saldino agreed with Dr. Turk that some clinicians don't want to be told what tests to order.

Dr. Tolchin, a neurosurgeon, testified for the defense he had reviewed the films of Townsend's lumbar spine and concluded they gave no indication of an unstable fracture. He also found Dr. Turk's report was within the applicable standard of care.

The trial court refused Townsend's request that a jury instruction, BAJI No. 6.11.5 (7th ed. 1986) "Reality of Refusal of Diagnostic Tests—Physi-

cian's Duty of Disclosure"[4] be given. However, the jury was given the standard instruction defining professional negligence for physicians and specialists, and was instructed on Townsend's burden of proof in showing Dr. Turk's negligence. The court then granted Dr. Turk's motion for non-suit on the informed consent cause of action, finding the applicable duty for a radiologist was to properly advise the treating physician who had consulted him and that a violation of that duty was negligence.

The jury deliberated on the negligence cause of action and rendered a defense verdict. Judgment was entered accordingly and Townsend timely appealed.[5]

## DISCUSSION

Townsend attacks the trial court's refusal to instruct the jury as requested on informed consent and the granting of the nonsuit on the same basis: the evidence could arguably have supported a plaintiff's verdict on the informed consent cause of action. In support of her claim of error she relies on the rules that a party is entitled to have the jury instructed on all theories for which there is evidentiary support in the record (*Truman* v. *Thomas* (1980) 27 Cal.3d 285, 295 [165 Cal.Rptr. 308, 611 P.2d 902]), and that a judgment granting a nonsuit may be sustained only if judgment for defendant is required as a matter of law, even interpreting the evidence most favorably to the plaintiff's case. (*Carson* v. *Facilities Development Co.* (1984) 36 Cal.3d 830, 839 [206 Cal.Rptr. 136, 686 P.2d 656].)

■ We thus must examine whether the doctrine of informed consent applies as a matter of law to a physician in Dr. Turk's position, a consultant radiologist who never examined the patient personally and whose professional function was confined to rendering advice and guidance to the clinician who consulted him on the patient's behalf. We first review the develop-

---

[4]BAJI No. 6.11.5 (7th ed. 1986), as refused, reads: "It is the duty of a physician to disclose to the patient all material information to enable the patient to make an informed decision regarding the taking or refusal to take a diagnostic test. [¶] Material information is information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject the diagnostic test or procedure. To be material a fact must also be one which is not commonly appreciated. [¶] Failure of the physician to disclose to the patient all material information, including the risk to the patient if the test is refused, renders the physician liable for any injury a [proximate] [legal] cause of which was the patient's refusal to take the test if a reasonably prudent person in the patient's position would not have refused the test if all material information had been given."

[5]Since the clerk's transcript prepared for this appeal does not include the judgment appealed from, we have taken judicial notice of that document in the superior court file. (Evid. Code, §§ 452, subd. (d), 459, subd. (a).)

ment of the theory of informed consent, which begins for our purposes with *Cobbs* v. *Grant* (1972) 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1]. In that case, the Supreme Court held "as an integral part of the physician's overall obligation to the patient there is a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each." (*Id.* at p. 243.)

In *Truman* v. *Thomas, supra*, 27 Cal.3d 285, the Supreme Court extended this doctrine to apply to diagnostic tests in what has been termed the "informed refusal" doctrine. (*Moore* v. *Preventive Medicine Medical Group, Inc.* (1986) 178 Cal.App.3d 728, 736 [223 Cal.Rptr. 859].) In *Moore*, the court described the doctrine as involving "a physician's responsibility to a patient when that patient refuses diagnostic testing before a diagnosis is made and treatment recommended. In a nutshell, a doctor has a duty to disclose all material information to his patient which will enable that patient to make an informed decision regarding the taking or refusal to take such a test." (*Ibid.*)

A commentator has explained the close relationship of informed consent and negligence theory: "Informed consent is a subcategory of professional negligence doctrine. Standard negligence analysis protects an interest in physical well-being. The doctrine of informed consent injects into the established framework of negligence a concern with patient choice that would otherwise be absent. It recognizes that one way that actionable physical injury may occur is through the failure to disclose information that would have resulted in non-consent to treatment. The concern with choice does not, however, rise to the level of a fully protected interest under negligence doctrine. Rather, choice remains encapsulated within the dominant interest in physical well-being. [Fn. omitted.]" (Shultz, *From Informed Consent to Patient Choice: A New Protected Interest* (1985) 95 Yale L.J. 219, 232.)

This commentator characterized a Washington case also cited by Townsend (*Gates* v. *Jensen* (1979) 92 Wn.2d 246 [595 P.2d 919]) as articulating a significant new standard in the field of informed consent, noting, however, the highest Washington court has since seemingly retreated from that approach in a later case (*Keogan* v. *Holy Family Hospital* (1980) 95 Wn.2d 306 [622 P.2d 1246]). (Shultz, *op. cit. supra*, 95 Yale L.J. at pp. 242-244.)[6] In

---

[6] The commentator drew this conclusion that the Washington courts are not firm in their resolve to expand the availability of informed consent theories from the split nature of the *Keogan* opinion. (Shultz, *op. cit. supra*, at p. 244, fn. 99.) The majority opinion, issued by three justices of an eight-member panel, followed the *Gates* analysis that a physician has a duty of disclosure whenever he or she becomes aware of a bodily abnormality that may indicate risk or danger, whether the diagnosis is complete or not. However, five justices joined in

*Gates*, the facts involved an ophthalmologist who performed a test on a patient that indicated she was in the borderline area for glaucoma and had certain indications of the disorder; however, the ophthalmologist did not tell the patient about the existence of two additional diagnostic tests nor recommend she have them. She later became functionally blind and sued for malpractice, alleging a lack of informed consent. The court, holding informed consent instructions should have been given, adopted a knowledge-based standard for disclosure of information to a patient: a physician has a duty of disclosure whenever he or she becomes aware of an abnormality which may indicate risk or danger. (*Gates* v. *Jensen, supra*, 595 P.2d at pp. 921-923, cited with approval in *Moore* v. *Preventive Medicine Medical Group, Inc., supra*, 178 Cal.App.3d 728, 739.)

In *Keogan, supra*, 622 P.2d 1246, the facts showed a treating doctor obtained test results that suggested but did not confirm that the patient had heart disease. The doctor concluded other causes had made the patient ill, did not disclose the possibility of heart disease or the suggestive test results, and also did not disclose that other tests were available to diagnose heart problems. The patient died of a heart attack and his survivors sued for medical malpractice. Reversing the judgment for defendants, the court required an instruction on informed consent to be given at a retrial to be limited, as to the treating doctor, to his liability for damages proximately caused by his failure to inform the patient of alternative diagnostic techniques. (*Id.* at pp. 1249-1250.) As already noted (see fn. 6, *ante*), while the majority opinion relied on the *Gates* standard, the concurring and dissenting opinion did not join in that part of the analysis. (See also Annot., Malpractice—Alternative Diagnosis Modes (1985) 38 A.L.R.4th 900.)

The cases discussed above (*Cobbs, supra*, 8 Cal.3d 229; *Truman, supra*, 27 Cal.3d 285; *Gates, supra*, 595 P.2d 919; and *Keogan, supra*, 622 P.2d 1246) uniformly involved the liability of treating physicians or therapists. Dr. Turk's relationship with Townsend more closely resembles that discussed in a pair of cases decided by the Court of Appeal for the First District, Division Four, which addressed informed consent issues in the context of the practice of a particular type of medical consultant or specialist, the pathologist. (*Jamison* v. *Lindsay* (1980) 108 Cal.App.3d 223 [166 Cal.Rptr. 443]; *Mahannah* v. *Hirsch, supra*, 191 Cal.App.3d 1520.)

---

a concurring and dissenting opinion which opined that negligence theory was adequate to give the plaintiffs a remedy for the treating doctor's inaction, and that no duty to inform on the part of the doctor had yet arisen since there was still no diagnosis or diagnostic procedure involving risk as to which the patient had a right to make a choice at the critical moment. (*Keogan, supra*, 622 P.2d at pp. 1260-1261.)

Since the type of practice we deal with here, radiology, is similar to pathology in its specialized nature, the holdings of *Jamison, supra*, 108 Cal.App.3d 223 and *Mahannah, supra*, 191 Cal.App.3d 1520, are instructive. *Jamison* was decided on grounds of instructional error which had been waived by the appellant. However, the court discussed to a limited extent the theories of recovery which could be brought against a pathologist, noting although that plaintiff was unable to assert the theory of informed consent due to the instructional problems, she still had an appropriate legal theory under which to seek damages, i.e., negligence. The court stated: "Negligent failure to advise a patient to pursue a potentially necessary course of treatment is actionable under ordinary medical negligence standards . . . ." (*Jamison, supra*, 108 Cal.App.3d at p. 231.) The court based this conclusion on the facts in *Jamison*, which showed the pathologist knew there were divergent opinions in the profession as to whether a certain type of tissue was potentially malignant; however, since he subscribed to one school of thought, he did not disclose the other to the patient. This was held to be potentially below the applicable negligence standard of care, even though the jury in that case did not find it to be so. (*Ibid.*)

In *Mahannah v. Hirsch, supra*, 191 Cal.App.3d 1520, the court went into more detail on the inappropriateness of charging a pathologist with a failure to obtain informed consent. Approving the pathologists' arguments they had no duty to disclose any information directly to the patient or to her treating physician, the court explained: "The customary duty of pathologists, they contend, is to disclose information they obtain from their pathological analysis directly to the physician who refers a tissue specimen to them for analysis . . . . We agree, and therefore affirm the judgment of dismissal." (*Id.* at p. 1526.)

The court relied on *Jamison v. Lindsay, supra*, 108 Cal.App.3d 223, and *Cobbs v. Grant, supra*, 8 Cal.3d 229, in reaching this conclusion, and distinguished a portion of *Jamison* which referred to the duty of a "therapist" to inform the patient of the available alternatives and hazards of treatment. (*Jamison, supra*, 191 Cal.App.3d at p. 230.) In *Mahannah*, only those doctors who had actively managed the plaintiff's care (the therapists) were held to be the ones with whom a duty rested to disclose information about necessary surgical procedures and postoperative care, particularly in view of the fact there was no evidence the consultant pathologists had ever had any direct contact with the patient. (*Mahannah, supra*, 191 Cal.App3d at p. 1527.) The court commented: "To impose a duty on a consulting pathologist to communicate with the patient regarding his evaluations would create an undue burden on the pathologist and could also be disruptive of the primary physician's relation with his patients." (*Id.* at pp. 1527-1528.)

We think this authority is well reasoned and that the better theoretical and practical approach is to confine a patient's claims against a specialist, such as a consulting radiologist, to theories of medical negligence, as opposed to permitting the assertion that informed consent on each treatment level should be obtained. The record here shows that it was the clinician, the emergency room doctor Witkin, who had the responsibility of deciding what course of action to take, what tests to order, and what treatment to prescribe, in view of the information given him by the radiologist. Dr. Turk did not deal directly with Townsend or make decisions about her care.

Nevertheless, Townsend argues that even if Dr. Turk had no duty to communicate directly to her, he should have given more or different information to Dr. Witkin, her treating physician, so that he could have passed it on to her and thus given her a more complete foundation for her decisions on the course of treatment she should follow. She points to language in *Mahannah* v. *Hirsch, supra*, 191 Cal.App.3d 1520, 1529, where the court commented: "While we did say [in *Jamison, supra*, 108 Cal.App.3d 223] there was a duty to disclose conflicting opinions, this could have been accomplished by conveying that information to . . . the primary treatment doctor, who in turn could convey that information to his patient."

This language is inapposite here, because the jury agreed with Dr. Turk that his report and reading of the film were adequate and within the standard of care. Therefore, the logical conclusion we must reach is that he did not have any subsidiary duty to recommend further testing or obtain consent therefor. (See *Scalere* v. *Stenson* (1989) 211 Cal.App.3d 1446, 1450-1453 [260 Cal.Rptr. 152], requiring as a predicate for a duty to disclose that a doctor have proposed some form of surgery, medical procedure, or therapy, or be aware that some other doctors following a different school of thought would do so.) Dr. Turk did not believe further testing was necessary to assist Dr. Witkin in making the correct decisions on Townsend's care, and the jury apparently agreed. As in *Scalere,* Dr. Turk could "hardly 'disclose' what he did not believe." (*Id.* at p. 1453.) It would not be appropriate to impose the "subcategory" of informed consent (Shultz, *op. cit. supra*, 95 Yale L.J. at p. 232) upon the facts of this case, where negligence theory is adequate to dispose of all issues presented to the jury.

## DISPOSITION

The judgment is affirmed.

Kremer, P. J., and Froehlich, J., concurred.