[No. G035929. Fourth Dist., Div. Three. Sept. 11, 2006.]

CHARLES M. WILSON, Plaintiff and Appellant, v.
ANDREW WALTER MERRITT, Defendant and Respondent.

COUNSEL

Matison & Margolese, Vana Parker Margolese and Wayne Hunkins for Plaintiff and Appellant.

Carroll, Kelly, Trotter, Franzen & McKenna, Richard D. Carroll and David P. Pruett for Defendant and Respondent.

OPINION

MOORE, J.—Plaintiff Charles M. Wilson (Wilson), a paraplegic, suffered a torn rotator cuff and a fractured shoulder during a manipulation under anesthesia procedure performed by a chiropractor, Dr. Mark Wardenburg (Wardenburg). Wardenburg was assisted during the procedure by a medical doctor, Dr. Andrew Walter Merritt (Merritt). Wilson filed a medical malpractice complaint against Merritt. Merritt made a motion for nonsuit, claiming he had no obligation to obtain Wilson's informed consent to the procedure. The court granted the motion and judgment was entered in favor of Merritt. Wilson appeals.

Wilson, who says a previous surgical procedure rendered him a paraplegic, insists that no one ever warned him prior to the manipulation under anesthesia procedure that he could suffer either a fractured bone or a torn rotator cuff. He maintains that if anyone had warned him, he never would have had the procedure. He argues that the court erred in finding that Merritt, who purportedly had marketed and recommended the procedure and to whom Wilson had posed questions about possible complications, had no duty to obtain his informed consent to the procedure. We hold that whether Merritt had a duty to obtain Wilson's informed consent, even though the procedure was going to be performed by Wardenburg, was a question of fact for the jury to determine.

Furthermore, we hold that the trial court erred in concluding that, as a matter of law, there was insufficient evidence of causation for a jury to find in favor of Wilson. A jury reasonably could determine that an adult paraplegic who was suffering some problems with stiffness and flexibility, but was functional in his then current condition, who was seeing some improvement in his condition through physical therapy, who had suffered devastating damage from surgery in the past, and who was so concerned about the potential risks associated with the recommended procedure that he took his mother with him to question the medical doctor on the topic, would indeed turn down the opportunity for the procedure if informed that it could result in a loss of his remaining mobility due to a torn rotator cuff or a fractured bone.

As Wilson argues, there is an order of magnitude in the difference in the quality of life of a paraplegic, who is at least able to get to the toilet by himself, and that of a functional quadriplegic, who cannot even do that. We reverse and remand.

## I

## FACTS

In 1982, Wilson was paralyzed from spinal surgery for scoliosis, rendering him a paraplegic. He was wheelchair bound and needed to use his arms and shoulders to get in and out of the wheelchair. In November 2001, Wilson had a stroke, and thereafter developed adhesive capsulitis in his shoulder.

Wilson first saw Merritt on December 13, 2002. Merritt was a board certified specialist in physical and rehabilitative medicine. He was also the medical doctor on staff at Orange County Pain and Rehab Medical Associates, Inc. (the clinic), and the director of its clinical side.

After evaluating Wilson's condition, Merritt recommended physical therapy for the shoulder, to be provided at the therapy side of the clinic. According to Merritt, at the first meeting he told Wilson about other possible treatments as well, including a procedure known as manipulation under anesthesia.

Dr. Chris Wendell (Wendell), a chiropractor at the clinic, was the one who provided the prescribed physical therapy. Wendell suggested to Wilson that he would benefit from the manipulation under anesthesia procedure. Wendell explained that the procedure involved putting the patient to sleep and then manipulating the arm so as to break up the adhesive capsulitis. At some point, Wilson was introduced to Wardenburg, another chiropractor at the clinic. Wardenburg also discussed the manipulation under anesthesia procedure with Wilson, briefly.

In order to get more information on the procedure, Wilson scheduled another appointment with Merritt. At trial, Wilson was asked why he went to Merritt for information instead of going to the chiropractor. Wilson responded: "Well, I believed Dr. Merritt was presiding over my overall care, and I trusted him. I thought because he was a physiatrist and he knew the . . . mechanics of the body, particularly the bones and the muscles, that he would know about this. And also particularly because I'm in a wheelchair, that he would know that something—if there were an adverse reaction to my arms, he should be on knowledge to let me know about that."

Wilson's mother, Maureen Wilson (Mrs. Wilson), went with him to the appointment with Merritt. Wilson asked Merritt about the manipulation under anesthesia procedure and whether there were any bad risks associated with it. Wilson explained he was concerned about undergoing procedures, because he had previously suffered paralysis due to surgery.

At trial, Wilson was questioned about what Merritt said when asked about the manipulation under anesthesia procedure. Wilson replied: "He seemed to think that there wasn't any risk. The only risk would be an [infection] from the Toradol shot." When asked, "You're talking about no risk from the procedure itself," Wilson responded, "That's correct." When asked whether he was told that "there might be risks from the anesthesia" and/or from "the shots involved," Wilson replied, "He said only from the Toradol shot after the M.U.A. was done." Wilson clarified: "[Merritt] didn't really seem to think that there was much risk other than the injection."

Wilson's attorney asked him, "You were never—were you ever told by anyone, anyone at Orange County Pain [and Rehab] anywhere, that you could actually sustain a fractured bone as a part of this procedure?" In response, Wilson said, "No one at any time had told me that I could sustain a fracture or torn rotator cuff. If that had happened, I would not have had the surgery and I would have been out of there immediately."

At trial, Mrs. Wilson also testified with regard to what Merritt said at the appointment. She said that she and Wilson each asked Merritt what could go wrong with the procedure. According to Mrs. Wilson, "Dr. Merritt said the only thing that could go wrong would be an infection from an injection." At trial, she was posed the question, "So at this meeting, did he give you any indication of any kind that this process, this M.U.A., could have a significant adverse effect?" Mrs. Wilson replied: "Absolutely not." She also testified that Merritt told them "[t]hat he would be part of this team that would perform this procedure." Wilson, too, testified that Merritt said he would "be there to supervise and assist."

When Merritt testified about the appointment, he stated: "I don't recall a lot about the conversation. Certainly [they were] both inquisitive, I'm sure. I did the best to answer them, at the same time, qualifying that I don't perform this procedure, and that specific procedure-related questions need to be directed to the person who performs them."

A few days after the meeting with Merritt, Wendell scheduled the manipulation under anesthesia procedure, to be performed by Wardenburg. The

procedure was performed on February 3, 2003. According to Wilson, Merritt was on hand before the procedure, and greeted him and put him at ease, providing assurances that the procedure should go well. Merritt gave Wilson a consent form for an injection that Merritt was going to administer. According to Wilson, Merritt created the impression that "he was in charge [and] was there to supervise and oversee the whole procedure."

Merritt, on the other hand, testified that the reason he attended the procedure was to administer an injection. However, he also acknowledged that he acted as the first assistant during the procedure. At deposition, he explained that the assistant position is "a nonskilled job of basically holding the patient so [he or she does] not fall off the table while the procedure is being performed by a skilled provider. . . . It is not necessary to have an M.D. perform that position."

Wilson suffered a fractured shoulder and a torn rotator cuff during the procedure. As a result, he had to undergo surgery to repair the damage.

Wilson filed a medical malpractice action against Merritt, Wardenburg, and certain others. The matter proceeded to a jury trial against Merritt, who successfully moved for nonsuit. Only the nonsuit in favor of Merritt is at issue on appeal, not any liability on the part of Wardenburg.

## II

## DISCUSSION

### A. Expert Witness Testimony:

Wilson's expert witness, Dr. Kendall Wagner (Wagner), was a board certified orthopedic surgeon who had performed many manipulations under anesthesia. He testified that it would be a violation of the standard of care to fail to obtain an informed consent from a patient. He also testified that it was the obligation of Wardenburg, as the one performing the manipulation under anesthesia, to obtain the informed consent, and that the February 3, 2003 procedure report indicated that Wardenburg had done so. Wagner acknowledged that Merritt did not indicate in his records that he had obtained an informed consent to the manipulation under anesthesia procedure. However, he stated his opinion that Merritt had no legal duty to obtain the informed consent with respect to the manipulation under anesthesia procedure.

In addition, Wagner testified repeatedly that, based on a review of certain medical records, he felt that both Wardenburg and Merritt had complied with the standard of care. Yet at the same time, he also testified repeatedly, that the issue in the case was not what the medical records reflected, but what Merritt had told Wilson and his mother when they went to him to learn about the manipulation under anesthesia procedure.

Portions of Merritt's testimony were read to Wagner. In response to hearing that testimony, Wagner said: "The . . . issue in this case is whether or not the patient and his mother were told that there were no potential complications in this procedure. If they were told that, it is a violation of [the] standard of care. If they weren't told that, it is not a violation of [the] standard of care. And I don't know the answer. I wasn't there." Wagner held fast to this position through repeated questioning.

B. *Motion and Ruling:*

After Wilson had rested his case, Merritt made a motion for nonsuit. Merritt's counsel argued that no cause of action based on informed consent had been established. More specifically, he stated that Wilson had failed to establish either a legal duty on the part of Merritt to obtain informed consent with respect to the manipulation under anesthesia procedure, or a failure on the part of Merritt to articulate any of the risks associated with that procedure. In addition, he asserted that Wagner had testified that he had no criticisms of Merritt.

The court, in granting the motion, provided its reasoning on the record. It stated that Merritt had no legal duty to obtain informed consent with respect to a procedure he did not perform. The court explained that Wardenburg, who was the one who had performed the manipulation under anesthesia procedure, was the one responsible for obtaining the informed consent, not Merritt. The court also noted that Wagner had opined Wardenburg did obtain informed consent. In addition, the court stated that according to Wagner, neither Wardenburg nor Merritt had breached the standard of care. Finally, with respect to causation, the court said that Wilson could not say in retrospect that he would not have undergone the procedure had he been informed of the risks, because he really had no other option, and in choosing to undergo the procedure, he accepted risks of greater harm than the harm he in fact suffered.

C. *Standard of Review:*

 " 'A defendant is entitled to a nonsuit if the trial court determines that, as a matter of law, the evidence presented by plaintiff is insufficient to

permit a jury to find in his favor. [Citation.] "In determining whether plaintiff's evidence is sufficient, the court may not weigh the evidence or consider the credibility of witnesses. Instead, the evidence most favorable to plaintiff must be accepted as true and conflicting evidence must be disregarded. The court must give 'to the plaintiff['s] evidence all the value to which it is legally entitled, . . . indulging every legitimate inference which may be drawn from the evidence in plaintiff'[s] favor.' " [Citation.] A mere [«]scintilla of evidence[»] does not create a conflict for the jury's resolution; 'there must be *substantial evidence* to create the necessary conflict." [Citation.]' [Citation.]" (*Adams v. City of Fremont* (1998) 68 Cal.App.4th 243, 262–263 [80 Cal.Rptr.2d 196].)

"We independently review the ruling on a motion for nonsuit, guided by the same rules that govern the trial court. [Citations.] We will not sustain the judgment ' " 'unless interpreting the evidence most favorably to plaintiff's case and most strongly against the defendant and resolving all presumptions, inferences and doubts in favor of the plaintiff a judgment for the defendant is required as a matter of law.' " [Citations.]' [Citation.]" (*Ewing v. Northridge Hospital Medical Center* (2004) 120 Cal.App.4th 1289, 1296 [16 Cal.Rptr.3d 591].)

D. *Analysis:*

(1) *Introduction*

Wilson argues that the question of whether Merritt obtained informed consent from him should have gone to the jury for determination. He contends that Merritt had a legal duty to obtain his informed consent and furthermore that Merritt mislead him when he said that the only risk associated with the procedure was the risk of infection from a shot. We agree that the matter should have gone to the jury.

(2) *Legal Duty*

■ " '[A]s an integral part of the physician's overall obligation to the patient there is a duty of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each.' [Citation.] The scope of a physician's duty to disclose is measured by the amount of knowledge a patient needs in order to make an informed choice. All information material to the patient's decision should be given. [Citation.] [¶] Material information is that which the physician knows or should know would be regarded as significant by a reasonable person in

the patient's position when deciding to accept or reject the recommended medical procedure. [Citations.] To be material, a fact must also be one which is not commonly appreciated. [Citation.] If the physician knows or should know of a patient's unique concerns or lack of familiarity with medical procedures, this may expand the scope of required disclosure. [Citation.]" (*Truman v. Thomas* (1980) 27 Cal.3d 285, 291 [165 Cal.Rptr. 308, 611 P.2d 902], fn. omitted.) The physician's duty to disclose is twofold. "First, a physician must disclose to the patient the potential of death, serious harm, and other complications associated with a proposed procedure. [Citation.]" (*Daum v. SpineCare Medical Group, Inc.* (1997) 52 Cal.App.4th 1285, 1301–1302 [61 Cal.Rptr.2d 260].) "Second, '[b]eyond the foregoing minimal disclosure, a doctor must also reveal to his patient such additional information as a skilled practitioner of good standing would provide under similar circumstances.' [Citation.]" (*Id.* at p. 1302.)

■ As the trial court acknowledged when explaining its ruling, the question of whether Merritt had such a legal duty to disclose under the particular circumstances of this case was not a question for Wagner, as the expert, to determine. Indeed, the Supreme Court has "stressed the paramount role of the trier of fact in informed consent cases. [It has] recognized, for example, that questions such as whether the danger posed by a failure to disclose a particular risk is remote, whether the risk was or was not commonly known, and whether circumstances unique to a given case supported a duty of disclosure [are] matters for the jury to decide." (*Arato v. Avedon* (1993) 5 Cal.4th 1172, 1184 [23 Cal.Rptr.2d 131, 858 P.2d 598]; see also *Truman v. Thomas, supra,* 27 Cal.3d at pp. 293–294; *Quintanilla v. Dunkelman* (2005) 133 Cal.App.4th 95, 115 [34 Cal.Rptr.3d 557].)

■ Merritt sees no issue for jury resolution. Rather, he contends that he had no duty to disclose because he was not the one performing the procedure, and informed consent is not required to be obtained at every treatment level. It is true that cases have held that certain consulting physicians have no duty to disclose. For example, a radiologist or a pathologist who reports directly to the referring physician, and never even has contact with the patient, is not responsible for making disclosures directly to the patient. (*Townsend v. Turk* (1990) 218 Cal.App.3d 278, 287 [266 Cal.Rptr. 821] [consulting radiologist]; *Mahannah v. Hirsch* (1987) 191 Cal.App.3d 1520, 1526–1528 [237 Cal.Rptr. 140] [consulting pathologist].) Such cases have concluded that "only those doctors who [have] actively managed the plaintiff's care (the therapists) [are] held to be the ones with whom a duty rest[s] to disclose information about necessary surgical procedures . . . ." (*Townsend v. Turk, supra,* 218 Cal.App.3d at p. 286.)

Merritt believes his role was that of a consulting specialist, such as the radiologist or pathologist. However, unlike the consulting radiologist in *Townsend v. Turk, supra*, 218 Cal.App.3d 278 and the consulting pathologist in *Mahannah v. Hirsch, supra*, 191 Cal.App.3d 1520, Merritt has had direct contact with Wilson. While there is conflicting evidence on the point, based on Merritt's own testimony it would appear that he was the first one to suggest the manipulation under anesthesia procedure to Wilson as a possible course of treatment, the first time Wilson went to his office. Moreover, Merritt was the medical director of the clinic and recommended the physical therapy to be provided there by Wendell. The evidence is undisputed that Wendell, a chiropractor, discussed the procedure with Wilson while providing the prescribed physical therapy treatment at the clinic, and that Wardenburg, also a chiropractor, had some discussion with Wilson about the procedure as well. The evidence is also undisputed that Wilson returned to his medical doctor, Merritt, to learn more about the procedure and seek his advice. In addition, Wilson and his mother each testified that they were under the impression that Merritt would be present during the procedure, and indeed he was, albeit to administer an injection and hold Wilson stable during the procedure, not to perform the actual manipulation. Given this factual scenario, "it is a question of fact whether [Merritt] was a mere consulting expert in this case (akin to a radiologist or pathologist) or 'shared joint responsibility' with Dr. [Wardenburg] for managing [Wilson's] care. [Citation.]" (*Spann v. Irwin Memorial Blood Centers* (1995) 34 Cal.App.4th 644, 656, fn. 11 [40 Cal.Rptr.2d 360].)

Merritt disagrees. He says *Daum v. SpineCare Medical Group, Inc., supra*, 52 Cal.App.4th 1285 is a similar case and supports a different conclusion. In *Daum*, the patient sought treatment at SpineCare Medical Group, Inc., a multidisciplinary practice specializing in the treatment of spinal problems. (*Id.* at p. 1295.) He met with Dr. Pletz, an internist, and Dr. Goldthwaite, an orthopedic surgeon. (*Ibid.*) Ultimately, Dr. Goldthwaite performed spinal fusion surgery on the patient, implanting an experimental device into his back. (*Id.* at pp. 1293, 1295–1296.) A year later, the device had to be removed due to infection in the surrounding area. (*Id.* at p. 1299.)

The patient filed a malpractice action against Dr. Pletz, Dr. Goldthwaite and SpineCare Medical Group, Inc. (*Daum v. SpineCare Medical Group, Inc., supra*, 52 Cal.App.4th at p. 1293.) He alleged that the defendants had failed to inform him that the fixation device implanted in his back was experimental in nature and that his surgery was part of a clinical investigation. (*Id.* at p. 1293.) The trial court granted a motion for nonsuit in favor of Dr. Pletz and the appellate court affirmed. (*Id.* at p. 1294.)

In *Daum*, California statutes and federal regulations required that the patient be informed of the experimental nature of the implanted device. (*Daum v. SpineCare Medical Group, Inc., supra,* 52 Cal.App.4th at pp. 1294, 1304–1305.) The court stated that "[t]he statutes and federal regulations on which the [patient relied] to establish the duty of disclosure clearly [held] 'the investigator' [citation] or the 'person who [was] primarily responsible for the conduct of a medical experiment' [citation] responsible for obtaining the subject's informed consent." (*Id.* at p. 1319.) It was the responsibility of Dr. Goldthwaite, as the designated investigator, to disclose the experimental nature of the device. Since Dr. Pletz was not an investigator, he was not responsible, under the statutes and regulations, for making the required disclosure. (*Ibid.*) Because the case before us, on the other hand, does not involve the application of a statutory or a regulatory scheme regarding particular disclosures, *Daum* is inapposite.

Wilson cites *Quintanilla v. Dunkelman, supra,* 133 Cal.App.4th 95, as a case more nearly on point. In *Quintanilla,* Dr. Daniel Dunkelman examined plaintiff Isabel Quintanilla and recommended surgery for her complaints. (*Id.* at pp. 101–102.) Dr. Dunkelman arranged for Dr. Ricardo Navas to perform the surgery. (*Id.* at p. 104.) Quintanilla and her husband subsequently filed a medical malpractice suit against Dr. Dunkelman, Dr. Navas, and the Cedars Towers Surgical Medical Group, among others. (*Id.* at p. 98.) Dr. Dunkelman asserted that he could not be held liable on the theory that he failed to obtain Isabel's informed consent, because he neither treated her nor operated on her. (*Id.* at p. 118.) He cited *Daum v. SpineCare Medical Group, Inc., supra,* 52 Cal.App.4th 1285 in support of his position. (*Quintanilla v. Dunkelman, supra,* 133 Cal.App.4th at p. 118.)

The court rejected Dr. Dunkelman's arguments. In so doing, it stated: "Unlike the situation in *Daum,* there is no federal statute or other rule of law in the instant case allocating the obligation to obtain informed consent solely to Dr. Navas. Viewing the evidence in the light most favorable to the judgment, the role of Dr. Dunkelman was more than merely that of a referring physician. Dr. Dunkelman owned all of the stock in Cedars Towers, and Dr. Navas was employed by Cedars Towers. Dr. Dunkelman was the physician who met with Isabel, made the diagnosis, and discussed treatment with her. Dr. Dunkelman informed Dr. Navas in a phone conversation what procedures Dr. Navas was to perform on Isabel. Isabel was not aware Dr. Navas would perform the surgery, believing instead that Dr. Dunkelman was going to be the surgeon. According to Isabel, she did not meet Dr. Navas before being put under anesthesia and was not examined by him. [¶] Given this factual record, the jury could reasonably conclude that Dr. Dunkelman shared responsibility for obtaining informed consent from Isabel." (*Quintanilla v. Dunkelman, supra,* 133 Cal.App.4th at pp. 118–119.)

■ The case before us has many parallels. While there is no evidence that Merritt had an ownership interest in Orange County Pain and Rehab Medical Associates, Inc., he was the medical doctor in charge of the clinical side. Wilson first met with Merritt, not Wardenburg, and there is evidence to the effect that Merritt was the first one to suggest the manipulation under anesthesia procedure. The chiropractors at the clinic also discussed the procedure with Wilson, who returned to Merritt to obtain his opinion on the procedure and learn of any risks involved. Merritt indicated that he would be there during the procedure, if only to administer an injection. Wilson believed that Merritt, as the medical doctor, would be the one "in charge" throughout the procedure. Indeed, Merritt greeted Wilson the morning of the procedure and provided assurances. Given this scenario, "the jury could reasonably conclude that [Merritt] shared responsibility for obtaining informed consent from [Wilson]." (*Quintanilla v. Dunkelman, supra,* 133 Cal.App.4th at p. 119.)

Either Merritt or Wardenburg could have obtained informed consent from Wilson and the consent so obtained would have been legally sufficient. (*Quintanilla v. Dunkelman, supra,* 133 Cal.App.4th at p. 119.) Although Wagner, in the case before us, observed that the February 3, 2003 procedure report indicated Wardenburg had obtained informed consent, Wilson testified that no one ever warned him that he could suffer a torn rotator cuff or a fractured bone. Inasmuch as " '[t]he testimony of one witness worthy of belief is sufficient to prove any fact' " (*id.* at p. 117), there was sufficient evidence from which the jury could have determined that neither Wardenburg nor Merritt had made the appropriate disclosures and obtained informed consent in this case.

### (3) *Breach of Standard of Care*

Irrespective of whether Merritt had a duty to obtain Wilson's informed consent, Wagner opined that if Merritt informed Wilson that there were essentially no risks associated with the procedure other than the risk of infection from an injection, Merritt's advice fell below the standard of care. In other words, applying Wagner's viewpoint, even if the jury were to determine that Merritt was not the one with a duty to obtain Wilson's informed consent, a separate potential basis for liability would be that Merritt, having undertaken a discussion of the procedure with Wilson, breached the standard of care by telling Wilson that there were no risks associated with the procedure.

In his briefing on appeal, Wilson touched upon this theory in passing, saying only that Merritt "mislead [him] by telling [him] that the only risk of the procedure was the risk of infection from the shot." At oral argument

before this court, Wilson argued more extensively that, irrespective of whether Merritt otherwise had a duty to obtain his informed consent, once Merritt undertook to explain the risks of the procedure, he was obligated to do so correctly. However, Wilson has not supported his argument with citation to legal authority. Inasmuch as we remand this case because the issue of whether Merritt had a duty to obtain Wilson's informed consent was not submitted to the jury, we need not also take the time to address a second theory that Wilson has failed to fully develop to date. However, Wilson is not precluded from raising that theory on remand.

### (4) *Causation*

Merritt contends that Wilson's appeal is confined to the limited issue of whether Merritt had a legal duty to obtain informed consent when Wardenburg was the one performing the manipulation under anesthesia. Merritt asserts that Wilson has waived any argument with respect to the alternative grounds for the court's decision, such as the failure to show causation. Merritt reminds us that the court, applying a subjective standard, concluded Wilson had not shown that any additional disclosures would have changed his willingness to undergo the procedure. In other words, the court held that Wilson had not demonstrated causation. Merritt says the judgment should be affirmed on the causation ground because Wilson failed to challenge the point.

We disagree. At trial, Wilson testified that if he had been told that there were risks of a bone fracture or a torn rotator cuff, he would not have had the procedure. Furthermore, Wilson's opening brief on appeal says: "Merritt never told him he could have a bone fractured or his rotator cuff torn. He was told the only risk was a possible infection from an injection after the procedure was over [citation]. No one at Orange [County] Pain and Rehabilitation told him he could sustain a fracture or torn rotator cuff [citation]. If they had he never would have had the surgery. [Citation.]" Wilson has not waived the causation issue.

██ "[A] physician is liable only where the failure to disclose *causes* the injury. [Citations.] 'There must be a causal relationship between the physician's failure to inform and the injury to the plaintiff. *Such causal connection arises only if it is established that had revelation been made consent to treatment would not have been given.*' [Citation.] Moreover, causation must be established by an *objective* test: that is, the plaintiff must show that reasonable 'prudent person[s]' in the patient's position would decline the procedure if they knew all significant perils. [Citations.]" (*Spann v. Irwin Memorial Blood Centers, supra,* 34 Cal.App.4th at p. 657.)

In other words, Wilson must show that a reasonable, prudent paraplegic, who had been largely paralyzed by a prior surgery and was dependent upon the use of his arms and shoulders for any mobility at all, and who, at that point, had already achieved about a 20 percent improvement in his adhesive capsulitis condition based on physical therapy alone, would have declined the procedure if informed that it could result in a torn rotator cuff and a fractured bone. There was sufficient evidence for a jury to conclude that, under the circumstances, a reasonable, prudent paraplegic would indeed have passed up the opportunity.

### (5) Party Admissions

In addition, Merritt, carefully framing his argument in the negative, says that during deposition Wilson did not claim that Merritt had undertaken the obligation to disclose risks with respect to the procedure. Merritt claims that this failure to articulate the undertaking of an obligation constituted an admission undermining Wilson's claims at trial. We disagree. Wilson consistently maintained that he had gone to see Merritt to seek information about the procedure and that Merritt had failed to warn him of any substantial risks associated with it. The fact that, in cited portions of the deposition testimony, Wilson confirmed that Wardenburg had explained certain aspects of the procedure and that the anesthesiologist had spoken to him about the anesthesia, did not mean that Wilson disclaimed any obligation on the part of Merritt to disclose risks.

Finally, while Merritt has pointed out some potential inconsistencies between Wilson's deposition testimony and his trial testimony, none of those potential inconsistencies would preclude this matter from being taken to the jury. As noted above, in reviewing a ruling on a motion for nonsuit, we do not weigh the evidence or assess the credibility of the witnesses. (*Adams v. City of Fremont, supra,* 68 Cal.App.4th at pp. 262–263.)

### (6) Conclusion

The court erred in granting the motion for nonsuit. Interpreting the evidence most favorably to Wilson and most strongly against Merritt, and resolving all doubts, inferences and presumptions in favor of Wilson, we cannot say that a judgment for Merritt is required as a matter of law. (*Ewing v. Northridge Hospital Medical Center, supra,* 120 Cal.App.4th at p. 1296.)

## III

## DISPOSITION

The judgment is reversed and the matter is remanded for further proceedings consistent with this opinion. Wilson shall recover his costs on appeal.

Sills, P. J., and O'Leary, J., concurred.

Respondent's petition for review by the Supreme Court was denied November 29, 2006, S147308.