[No. B171789. Second Dist., Div. Five. Sept. 12, 2005.]

ISABEL QUINTANILLA et al., Plaintiffs and Appellants, v.
DANIEL S. DUNKELMAN et al., Defendants and Appellants.

**[CERTIFIED FOR PARTIAL PUBLICATION\*]**

*Pursuant to California Rules of Court, rules 976(b) and 976.1, this opinion is certified for publication with the exception of parts II thru XIV of the discussion.

## COUNSEL

Law Offices of Howard A. Kapp and Howard A. Kapp for Plaintiffs and Appellants.

Thelen Reid & Priest, Curtis A. Cole, E. Todd Chayet; Schmid & Voiles and Patrick Mayer for Defendants and Appellants Daniel S. Dunkelman and Cedars Towers Surgical Medical Group.

Reback, McAndrews & Kjar, Robert C. Reback and Melanie Shornick for Defendant and Appellant Ricardo Navas.

## OPINION

## KRIEGLER, J.—

### PROCEDURAL HISTORY

Plaintiffs Isabel and Ramon A. Quintanilla[1] filed a second amended complaint against defendants Clinica Medica General,[2] Los Angeles Surgical Center,[3] Cedars Towers Surgical Medical Group (Cedars Towers), Ricardo Navas, M.D., and Daniel S. Dunkelman, M.D., alleging causes of action against defendants for negligent medical care including lack of informed consent, battery, and intentional infliction of emotional distress. The second amended complaint further alleged that Ramon sustained a loss of consortium. The jury returned a verdict in favor of Cedars Towers, Dr. Navas, and

---

[1] The Quintanillas are hereafter referred to individually as Isabel and Ramon or collectively as plaintiffs.

[2] The jury found in favor of Clinica Medica General, and it is not a party to this appeal.

[3] Los Angeles Surgical Center was dismissed midtrial and is not a party to this appeal.

Dr. Dunkelman (collectively defendants) on the causes of action for battery and intentional infliction of emotional distress. Defendants were found to have provided negligent care and treatment for Isabel. The jury further found in favor of Ramon for loss of consortium due to the negligence of defendants. The jury apportioned fault at 20 percent for Dr. Dunkelman, 40 percent for Dr. Navas, and 40 percent for Cedars Towers pursuant to a verdict form supplied by the trial court. Past damages for Isabel were fixed at $180,000, and $200,000 for future damages. Ramon was awarded $30,000 for past damages and $30,000 for future damages.

A judgment was entered dividing liability among the culpable defendants by the percentages of fault determined by the jury. As to Isabel, the total amount of damages was reduced from $380,000 to $250,000 pursuant to the Medical Injury Compensation Reform Act (Civ. Code, § 3333.2, hereinafter MICRA). The damages were allocated as follows: Dr. Dunkelman—$50,000; Dr. Navas—$100,000; and Cedars Towers—$100,000. As to Ramon, damages were apportioned in accordance with the jury verdict as follows: Dr. Dunkelman—$12,000; Dr. Navas—$24,000; and Cedars Towers—$24,000.

Costs were awarded in favor of plaintiffs and against defendants. Defendants have filed timely appeals. Plaintiffs also appeal.

Dr. Navas contends on appeal as follows: 1. Isabel signed a consent form which she had the ability to read and understand, and she was verbally given informed consent; 2. The procedures were not negligently performed on her; 3. The trial court erred in presenting the jury with an ambiguous general verdict form, rather than the special verdict form requested by all parties; and 4. The trial court erred in awarding costs under Code of Civil Procedure section 998, as plaintiffs failed to obtain a more favorable outcome.

Dr. Dunkelman contends on appeal as follows: 1. A physician who examines a patient cannot be held liable for the treating physician's subsequent failure to obtain informed consent; 2. The trial court erred in providing the jury with an ambiguous general verdict form that did not provide for a special finding of informed consent as distinct from medical malpractice; 3. The trial court prejudicially erred in prohibiting defendants' experts from testifying about standards of informed consent, while allowing plaintiffs'

experts to provide such testimony favorable to plaintiffs; and 4. The trial court prejudicially erred in awarding costs under Code of Civil Procedure section 998, where plaintiffs received a judgment against Dr. Dunkelman for less than the amount requested in their statutory offer.

Cedars Towers contends on appeal as follows: 1. A signed consent form indicating the patient was informed of the procedures' risks and complications is conclusive evidence of informed consent; 2. The trial court prejudicially erred in presenting the jury with a verdict form that allowed the jury to find Cedars Towers independently liable and did not distinguish between medical malpractice and informed consent; 3. The trial court prejudicially erred in prohibiting defendants' experts from testifying about standards of informed consent, while allowing plaintiffs' experts to provide such testimony favorable to plaintiffs; and 4. The trial court prejudicially erred in awarding costs under Code of Civil Procedure section 998, where plaintiffs received a judgment for less than the amount requested in their statutory offer.

Plaintiffs contend on appeal as follows: 1. The trial court's refusal of jury instructions on the substance of Business and Professions Code section 654.2 was error and prejudicial as to plaintiffs' intentional tort claims; 2. It was error for the trial court to refuse a proposed instruction that there is a fiduciary duty to obtain informed consent; 3. It was error to refuse to instruct that Dr. Dunkelman had a fiduciary duty to inform his patient that Dr. Navas was an employee and not merely an unrelated and independent colleague; 4. The trial court erred in refusing to allow Isabel to testify that she would have refused a procedure on her labia had it been suggested; 5. The erroneous refusal of a joint enterprise instruction may have impacted the jury's decision on the intentional torts; 6. The trial court erred in failing to direct the jury on the imputations of liability; 7. The trial court's refusal to instruct the jury that Dr. Dunkelman was required to inform the patient that Dr. Navas was effectively his employee denied plaintiffs the ability to argue that this referral violated Dr. Dunkelman's fiduciary duty to plaintiffs; 8. The trial court erred in failing to enter judgment against Cedars Towers in the amount of $250,000 for Isabel and $60,000 for Ramon; 9. The trial court erred in not entering judgment for prejudgment interest against Cedars Towers from the date of the $249,999.99 and $21,249.99 statutory offers; and 10. Plaintiffs have established prejudicial error affecting the intentional tort claims.

## STATEMENT OF FACTS

A. *The Parties to the Lawsuit*

Isabel, age 32, came to the United States in 1971 at the age of 10 months. She attended school through the 10th grade, taking classes in Spanish in the seventh and perhaps the eighth grades. Although fluent in Spanish, Isabel cannot read Spanish. She is fluent in English. Isabel and her husband, Ramon, have two sons. Isabel and Ramon shared a normal sex life though the 1990's, engaging in sexual relations two to three times per week.

Dr. Daniel Dunkelman owns 100 percent of the stock and is chairman of the boards of the Los Angeles Surgical Center, Los Angeles Clinica Medica General, and Cedars Towers Surgical Medical Group. Dr. Dunkelman is a board-certified general surgeon who performs gynecological surgery. Dr. Dunkelman treated and evaluated Isabel in 2000 and 2001, eventually referring her for surgery to be performed by Dr. Navas.

Dr. Navas is a general surgeon who spent four to six months in residency in gynecology, but is not a gynecologist. He works for Cedars Towers.

B. *Events Prior to the Surgery*

1. *Isabel's Testimony*

Isabel sought treatment from Dr. Dunkelman in 2000 at the Clinica Medica General for gynecological problems, including vaginal bleeding and associated pain. Isabel and Dr. Dunkelman conversed in Spanish. Isabel thought Dr. Dunkelman was a gynecologist. She eventually had surgery in June 2001.

Three days before the surgery, Isabel was examined by Dr. Dunkelman. Isabel was suffering from a recurring problem of a pimple located on the right side of her vagina and excessive bleeding and related pain. Dr. Sid Kamrava had previously performed a procedure on a similar pimple, which provided prompt relief. Dr. Dunkelman did not answer Isabel's questions about the pimple other than to say he would take care of it, although he did not indicate when it would be treated. Isabel had expected the pimple to be treated in the office, as had been her experience with Dr. Kamrava. Isabel had never heard the word "vulva" in 2001 and did not know what it meant. Dr. Dunkelman did not use the word "lesion" in describing the pimple, nor did he give her any options or tell her of any risks with having surgery in that area.

Based upon Isabel's complaints, Dr. Dunkelman suggested surgery—which he referred to in Spanish as a "raspado," a word that translates into a cleaning or scraping. Although unfamiliar with the term, Isabel did not ask what "raspado" involved, because she trusted Dr. Dunkelman. She knew she was going to be treated with a "raspado" at the surgery center for her bleeding problem. She did not know if she would be put under anesthesia or how long the procedure would last. Isabel could not recall whether she had a "raspado" before 2001. Isabel did not know the meaning of the terms dilation and curettage (D&C).[4] Dr. Dunkelman did not advise Isabel orally or in writing concerning his financial relationship with the surgical center, nor did she have knowledge of the relationship.

Dr. Dunkelman did not inform Isabel that he recommended a procedure in which an instrument would be inserted through her abdomen into her stomach so doctors could see what was happening in there. Before filing the lawsuit, Isabel had never heard of a Bartholin's gland. The "raspado" was scheduled for three days after her last visit with Dr. Dunkelman. She received no preoperation instructions about the "raspado." She believed the "raspado" would be performed by Dr. Dunkelman, because he was the person she went to see.

### 2. Dr. Dunkelman's Testimony

Dr. Dunkelman saw Isabel in March 2000 at the Clinica Medica General, at which time she complained of a variety of problems including pelvic pain, irregular menstrual cycles, recurrent urinary tract infections, dysmenorrheal, and metrorrhagia. His examination did not reveal any mass or lesion on her external genitalia, nor did her chart reflect any asymmetry of her right and left labia, and surgery was not indicated.

In April 2001, Isabel complained to Dr. Dunkelman of pelvic pain, vaginal itching, irregular and heavy menstrual cycles, and abdominal distention. Following an examination, Dr. Dunkelman recommended, under anesthesia, a D&C procedure, and a laparoscopy. His examination revealed a possible pelvic mass on the internal genitalia.

Isabel returned to Dr. Dunkelman later in April 2001, complaining of vaginal bleeding, pelvic pain, irregular menstrual cycles, dysmenorrheal, and

---

[4] A dilation and curettage is a common procedure for diagnosis of uterine pathology, which provides information about the possible origin of bleeding and rules out a tumor or cancer, or any other pathology. It is used to stop vaginal bleeding, but is mostly for diagnosis, and is normally done under general anesthesia.

metrorrhagia. They discussed doing a D&C and laparoscopy[5] to find the cause of her problems. Dr. Dunkelman did not find a pimple or lesion on her external genitalia.

Dr. Dunkelman discussed the proposed procedures in Spanish with Isabel. He believed Isabel read and spoke perfectly. Dr. Dunkelman did a pelvic exam and wrote "vaginitis vulvitis," meaning congestion and inflammation of the vulvar area and vagina, but did not document any lesions. He told Isabel she needed the laparoscopy to check the origin of her pelvic pain. The D&C would be performed to locate the source of the bleeding. Isabel had several unremarkable ultrasounds that revealed no mass and were intended to confirm there was no pathology causing the pain in the lower abdomen and pelvis. The only suggestion of a mass was something Dr. Dunkelman felt, combined with an ultrasound, that showed a slightly inhomogeneous mass.

At an examination on June 26, 2001, three days prior to the surgery, Isabel complained of bleeding after her period, although she was not bleeding that day. She also complained of a right vulvar mass and gave him a history of that mass in the past. Isabel described pain in the lower abdominal area, pain in the pelvic area, pain with the menstrual cycles and continued bleeding, and a lesion in the cervical area. In his examination, Dr. Dunkelman found a pimple on the external genitalia, which he described as a "right vulvar mass" that had two previous episodes of infection. Isabel said she had recurrent infections in that area and surgeries before, one of which had been done by Dr. Dunkelman.

There are glands known as Bartholin's glands on both sides of the vagina at the 4:00 and 8:00 positions, which become cysts when full of liquid. The gland, located in the middle of the labia minora, provides lubrication of the vulvar area. Dr. Dunkelman has treated many Bartholin's cysts, which are quite common. Isabel said she had a cyst lanced in the past. Dr. Dunkelman did not see a Bartholin's cyst—he saw a very small solid mass in the middle of the vulvar area. Dr. Dunkelman's impression was that Isabel had an indurated mass, but that it could be a Bartholin's cyst. The mass needed to be removed to find the problem for diagnosis. He wrote on her chart that Isabel had a recurring infection of the Bartholin's cyst.

The best treatment of the cyst was to remove the solid mass or lesion and send it to pathology for diagnosis. Dr. Dunkelman told Isabel she could have the lesion removed or leave it. He explained the procedure could result in infection, pain, bleeding, or death. Dr. Dunkelman's expectation was that

---

[5] A laparoscopy refers to an abdominal pelvic scoping to diagnose or treat without opening up the patient. It is a surgical procedure performed under general anesthesia.

Isabel could return to sexual relations without pain in four to six weeks. Isabel decided to have the lesion removed.

Dr. Dunkelman did not expect Isabel's condition to change in the next few days. Isabel was in pain and wanted the operation that week, but Dr. Dunkelman was not available. The best day for her was Friday, and Dr. Dunkelman told Isabel that Dr. Navas was available that day. She agreed. Dr. Dunkelman directed Isabel to the Los Angeles Surgical Center rather than other available locations, because it was very convenient and she knew the location from a prior surgery. Dr. Dunkelman did not tell Isabel he owned all the stock to the Los Angeles Surgical Center. Dr. Dunkelman always informs his patients that he owns the Los Angeles Surgical Center.

Dr. Dunkelman referred Isabel to Dr. Navas. Dr. Dunkelman told Isabel that Dr. Navas worked for him and was his associate at Cedars Towers. Dr. Dunkelman spoke to Dr. Navas once before the surgery and two or three times after the surgery. Most likely, Dr. Dunkelman called Dr. Navas, although he has no record of the call. He most likely told Dr. Navas about the procedure, the symptoms, the complaints, physical findings, and the type of surgery. Dr. Dunkelman told Dr. Navas there was a small indurated lesion in the right vulvar area that was infected before and the lesion was to be removed.

Dr. Dunkelman expected Dr. Navas to examine Isabel before the procedure, which could be done better under general anesthesia. Dr. Navas told Dr. Dunkelman he found the right vulvar lesion and removed it. Dr. Navas said he found an indurated mass as described by Dr. Dunkelman on June 26. From the pathology, Dr. Dunkelman thought it was a benign lesion of the vulva.

No laboratory work was ordered the day before the surgery. Isabel was given a piece of paper with preoperation orders.

English and Spanish language signs had been present on the walls at the Los Angeles Surgical center since it opened in 1996, stating patients are welcomed by Dr. Dunkelman, owner of the surgical center. The signs notify patients of their right to choose their own health provider. The signs were placed in a visible area based on the advice of an attorney.

Dr. Dunkelman last saw Isabel as a patient on July 10, 2001.

3. *Silvina Sotelo*

Ms. Sotelo, who speaks English and Spanish, is the office supervisor at the Los Angeles Surgical Center, having worked there since it opened in 1996 or

1997. The surgical center has a policy to contact patients to remind them of their appointments and to see if they understand the procedure they will be undergoing. Ms. Sotelo called Isabel, who said Dr. Dunkelman had explained the procedure to her. Isabel asked if Dr. Navas was going to do the procedure, and Ms. Sotelo replied "yes." Isabel said she was going to have a "raspado," but Ms. Sotelo also told her she was going to have a laparoscopy and excision of her vulvar mass. Isabel said Dr. Dunkelman explained that to her. The conversation was in Spanish.

Ms. Sotelo saw Dr. Navas meet with Isabel before the surgery in the preoperation area. Ms. Sotelo spoke to Isabel after the surgery and gave Isabel a pad to use when Isabel said she had some bleeding. Ms. Sotelo gave Isabel postoperative instructions to keep the wound clean and dry. Isabel was given medication and ordered to return for a follow-up appointment the following Tuesday.

## C. *The Surgery and Its Aftermath*

### 1. *Isabel's Testimony Regarding the Surgery*

Isabel arrived at the Los Angeles Surgical Center at 6:00 a.m. on Friday, June 29, 2001. A female employee gave Isabel a stack of papers and told her where to sign and initial, which took five minutes. There was no place to sit and read the forms, and the person helping Isabel with the paperwork seemed to be in a hurry. Isabel was told to sign and initial a consent form written in Spanish, which she could not read. Isabel did not read the documents and did not ask the woman what she was signing. Isabel did not know the meaning of the words vulvar, lesion, or excision, nor did she understand the meaning of aspiration or laparoscopy. Isabel had never heard the terms laparoscopy or D&C. She signed the forms without getting an explanation. No one at the Los Angeles Surgical Center referred to the procedures as surgery.

After changing into a gown and waiting several hours, a nurse gave Isabel an I.V. Isabel was unaware she was going to be put under general anesthesia. Isabel did not see Dr. Dunkelman on the day of surgery, was not spoken to by a doctor before surgery, and had no recollection of meeting Dr. Navas.

After the operation, Isabel woke up experiencing vaginal pain. A woman entered the room and told Isabel to get dressed. Isabel became frightened when she took off the hospital gown and noticed she was bleeding heavily. Isabel was told this was normal and given a cotton pad to cover her vaginal area.

A few days later, Isabel noticed stitches on the lip of her vagina in an area where the pimple had been. The area hurt when rubbed, such as by contact

with her underwear or wiping after going to the bathroom. Isabel was surprised to see stitches. She showed the area to her husband, who acted quiet and surprised.

Isabel decided to try to see Dr. Dunkelman on the Tuesday after the surgery, but he was not at the Clinica Medica General. Isabel told a female doctor she was not feeling well. She was examined in stirrups, but the doctor said there was nothing she could do for Isabel. Isabel was informed Dr. Dunkelman would likely be back the following Tuesday.

Isabel saw Dr. Dunkelman three weeks after the surgery. She did not ask to see Dr. Navas, because she did not know about him and, in fact, first heard his name when she gathered her medical records after the surgery. Dr. Dunkelman did not examine her and did not place her legs in the stirrups. He told her, when asked, that she could engage in sexual relations.

Isabel was not sure she had sexual intercourse with her husband again after the surgery in 2001. Intercourse was not painful before the surgery and took place two to three times per week. Isabel went into depression over the thought that she was a young woman who could not have intercourse with her husband. Her condition after the surgery impacted her ability to take care of her children, who are most important in her life. Isabel stopped driving the children to activities as she had done before the surgery. She has not had pain-free intercourse with her husband since the operation in June 2001. In 2002 and 2003, she had intercourse with her husband perhaps once a month, but it was painful, very fast, and she could not experience different positions as before. She had to alter her clothing so that it did not rub against her.

### 2. Ramon's Testimony

Up until 2001, Ramon's sex life with Isabel had a frequency of two to three times per week. Isabel spent more time with the children before the operation. Isabel showed Ramon the results from the surgery. She looked scared, upset, and confused, and Ramon was shocked. Ramon saw missing parts and something that was not normal. After the surgery, Isabel has pain on the right side of her vagina during intercourse. Sexual intercourse after the operation is limited to once or twice a month and is painful for Isabel. Isabel's self-esteem is low, she feels depressed sometimes, and Ramon has seen her crying.

### 3. Dr. Navas's Testimony

Dr. Navas first heard of Isabel in June 2001, in a telephone conversation with Dr. Dunkelman. Dr. Dunkelman wanted Dr. Navas to perform a surgery

because Dr. Dunkelman was not available. Isabel's chart does not document the phone call from Dr. Dunkelman.

Dr. Dunkelman told Dr. Navas that Isabel knew that Dr. Navas would perform the surgery. Dr. Dunkelman described Isabel's problems as including pelvic and back pain, heavy menstrual bleeding, and a lesion or mass in the labia or vulva that required excision. Dr. Dunkelman said Isabel had a procedure done on the mass once before, which sounded like a Bartholin's cyst where the aspirated fluid was withdrawn and indurated. Dr. Dunkelman and Dr. Navas had only one conversation about Isabel before the surgery.

Dr. Navas had a conversation with Isabel sometime between 6:30 a.m. and 7:00 a.m. on June 29, 2001, before she was put under general anesthesia. The conversation with her lasted about three minutes. Dr. Navas did not do a physical examination before general anesthesia. He did tell Isabel he was a surgeon, but he did not know if Isabel was aware that Dr. Navas was not a gynecologist.

Dr. Navas reviewed Isabel's laboratory values, her preoperative office visit form, the informed consent form, and a pelvic ultrasound report. The laboratory values were from tests in March 2001, three months before the surgery. Isabel said she had been bleeding from the vagina for prolonged periods of time, which might have had an affect on her laboratory values.

Dr. Navas introduced himself to Isabel, said that he was Dr. Dunkelman's associate, that he understood Dr. Dunkelman had spoken to her about Dr. Navas doing the operation, and that she was going to have an exam under anesthesia. He asked her several questions about the bleeding and the pain, and Isabel explained the problems to Dr. Navas. Isabel told Dr. Navas she had a sore area, describing it as either a nodule, a mass, or a lesion. Isabel said she had aspirations or lancing procedures performed once or twice in the past. Dr. Navas told her they would look at the area under anesthesia and remove the mass or lesion. They spoke about how much pain she would experience. Dr. Navas explained that the laparoscopy procedure involved a small incision, putting a needle inside her, blowing in gas, and looking around with a scope. They would look at her organs, aspirate cysts, and biopsy lesions to arrive at a diagnosis. Because Isabel had a previous laparoscopy and D&C, she was given short explanations of the procedures. The risks Dr. Navas discussed with Isabel were bleeding, scarring, and injury to the abdomen or the bowels.

Dr. Navas performed an examination under anesthesia, finding a mass in the right labia, which he excised and sent to pathology for analysis. According to his operative notes, he removed a cystic lesion right under the skin of the labia and used two or three stitches to close up the area. An infected cyst

could have been left alone, lanced, or removed. Dr. Navas only offered to remove it or leave it alone. Dr. Navas thought there was a small possibility Isabel had a Bartholin's cyst. The surgery was uneventful.

Dr. Navas spoke to Isabel after the operation, but she was a little sleepy and he would not expect her to remember the conversation. Dr. Navas expected that Isabel could have pain-free intercourse four to six weeks after the surgery. Dr. Dunkelman was to see Isabel post operatively.

### 4. *Claudia Frias*

Ms. Frias is a registered nurse who began working at the Los Angeles Surgical Center in November 1998. Ms. Frias did not remember Isabel, but worked with a patient with Isabel's name on June 29, 2001. Patients at the Los Angeles Surgical Center filled out forms as directed by office staff.

Ms. Frias was involved in filling out the preoperative nursing record after Isabel was brought to the pre-operation room. Ms. Frias filled out, signed, and witnessed Isabel's consent form at 6:03 a.m. She could not tell from Isabel's records whether or not Dr. Navas spoke to Isabel before the consent form was signed. The consent form contains writing referencing "examination under anesthesia, [D&C], laparoscopy, possible biopsy, possible aspiration, [and] excision of the vulvar lesion." Ms. Frias is a native Spanish speaker, but does not read Spanish because she was never taught the language. Ms. Frias did not remember if she saw Isabel sign the consent form. Ms. Frias signed the consent form because she was the one who filled it out. Normally, someone in the office would obtain the patient's signature.

Ms. Frias did not know if she asked Isabel if she understood the consent. Her practice was to review the form with the patient to see if the patient agreed. She assumed Isabel was Spanish speaking. The consent form was signed on the Spanish language side, with nothing written on the English language side.

## D. *Expert Testimony*

### 1. *Dr. Stephen Pine (Plaintiffs' Expert)*

Dr. Stephen Pine, an obstetrician and gynecologist, testified as plaintiffs' expert witness on the standard of care. He has a full-time practice and teaches part-time at the University of Southern California. Dr. Pine saw Isabel and reviewed Dr. Navas's report. He also read notes of the admission physical by Dr. Dunkelman, the operation and surgical reports, the report of the defense expert witness (Dr. Albert J. Phillips), and the admission paperwork from the

Los Angeles Surgery Center. Dr. Pine concluded that Isabel had four procedures: an examination under anesthesia, a D&C, removal of tissue from her right vulva or vagina, and a laparoscopy. It appeared to Dr. Pine that Dr. Navas was doing the procedures Dr. Dunkelman thought were necessary. Dr. Pine found no mention in Isabel's history of pelvic pain and no documentation of pelvic masses so the laparoscopy was not necessary. Dr. Pine was reluctant to criticize Dr. Dunkelman for the laparoscopy, since he was not present at the examination, but based on Isabel's chart, showing no current blood work, normal ultrasounds, and one pelvic exam showing enlarged ovaries, he saw no indication for the laparoscopy.

The standard practice to justify a laparoscopy calls for talking with the patient. A mention of pelvic pain does not warrant an operation. According to a diagram drawn by Dr. Dunkelman on June 26, 2001, Isabel had a problem in the right labia minora, in the mid-portion of the vulva. On June 26, 2001, Dr. Dunkelman found what he thought was a Bartholin's cyst infection; Dr. Pine disagreed with Dr. Dunkelman's opinion. The pathology report revealed it to be a sebaceous cyst. If a lesion is palpated (felt) and barring any intervening treatment, Dr. Pine would expect the lesion to be there three days later. One cannot palpate a Bartholin's gland that is not cystic, because the gland is not normally enlarged. An acute Bartholin's gland can be very red and tender, requiring treatment when it reaches the acute abscess stage. The treatment calls for opening the area with a scalpel and putting in a catheter or a small tube for draining. It needs to drain before sealing or the abscess will continue.

Dr. Pine believed Dr. Navas did not examine Isabel before putting her under general anesthesia, which did not comply with the standard of care. It is not ethical or proper to do surgery relying on another physician's findings. It is not responsible to subject a patient to surgery without examination by the surgeon, who makes his or her own determination. The standard of care requires that the patient know who the surgeon was going to be. Dr. Navas testified he had a three-minute conversation with the patient before surgery, which did not seem long enough to get the necessary information according to Dr. Pine, but it was possible.

The laboratory work was done on Isabel on March 30, 2001, three months before the surgery. As a result of her complaint of bleeding, Dr. Pine was of the opinion current blood levels should have been obtained before the operation. The preoperative diagnosis was vulvar mass, but did not indicate the location of the mass. The operative report indicates there was excision, meaning removal.

The operative report stated that the patient complained of some back pain and a history of a right vulvar mass with recurrent infection as determined by

bi-manual pelvic examination of pelvic mass. Isabel was advised to undergo excision of a mass that was not palpable, which confused Dr. Pine. Just as Dr. Pine could not testify that the laparoscopy was indicated without more history, he did not think Dr. Navas should have performed the laparoscopy because he did not examine Isabel except under anesthesia. Because Dr. Navas performed his examination after Isabel was under general anesthesia, he would not have been able to discuss with her whether to remove or do anything regarding the right vulvar mass, which is below the standard of care.

Dr. Pine believed Dr. Dunkelman thought Isabel had a Bartholin's cyst, but Dr. Navas removed a mass he did not palpate. Dr. Navas removed a pimple, a little sebaceous area of what could turn into a sebaceous cyst. It was below the standard of care for Dr. Navas to rely on Dr. Dunkelman's findings made 72 hours earlier. There was no reason to remove the pimple based on an examination while Isabel was asleep. In Dr. Pine's opinion, the proper operation under the circumstances was the D&C, which was performed. The laparoscopy and the excision of the right vulvar mass were not justified within the standard of care, although the laparoscopy was performed competently and Isabel suffered no harm from the procedure.

Dr. Pine examined Isabel and determined there was surgical removal of the labia minora on the right,[6] which was smaller than the same area on the left. Dr. Pine agreed with the defense expert witness that Isabel had a neuroma[7] in the area removed. Isabel had exquisite pain in the area on the right when examined. Isabel explained that the area was painful to touch and during intercourse, and she considered it ugly.

A consent form indicates that the patient understands exactly what procedures are going to be performed and constitutes authorization that the patient gives consent for the procedures. The consent form was signed at 6:03 a.m. and witnessed by Ms. Frias. A progress note signed by Dr. Navas indicates informed consent was done at 7:00 a.m. It would have been sufficient for purposes of introduction if Dr. Dunkelman said Dr. Navas was going to do the surgery and Dr. Navas introduced himself before the operation. It is the physician's duty to explain the procedures.

The procedures listed on the consent form were examination under anesthesia, D&C, laparoscopy with possible biopsy and possible aspiration of the cystic fluid, and excision of the vulvar lesions. Isabel told Dr. Pine she knew she was having surgery, but it was not described to her by the surgeon who performed the operation, and she did not understand the laparoscopy procedure.

---

[6] Dr. Pine does not think Dr. Navas removed Isabel's right labia. Dr. Pine believed it was Dr. Kamrava who removed a great deal of the labia.

[7] A neuroma is an acute inflammation of the nerves.

Dr. Pine did not criticize the way in which Dr. Navas performed the surgical procedures. He did, however, find fault with the process that lead Isabel to the operating room and was of the opinion the procedures performed were unnecessary.

### 2. *Dr. Enid Reed (Plaintiffs' Psychologist)*

Dr. Reed is a psychologist and neuropsychologist who met with Isabel and her husband for evaluation. Dr. Reed did not give Isabel a psychological test because she did not expect valid results. Dr. Reed found Isabel to be suffering and having feelings of rage and grief. Dr. Reed assessed Isabel's ability to give informed consent. Dr. Reed concluded Isabel lacked the ability to question authority figures. Isabel believes what authority figures say is true and tends to follow their orders. Isabel told her that if a doctor tells a Hispanic to do something, the Hispanic believes it.

For her entire life, Isabel was a nonassertive person who accepted authority. Dr. Reed gave as an example the fact that Isabel never applied for a promotion at work at Costco. Dr. Reed was of the opinion Isabel did not read Spanish well. Isabel reads some words in Spanish without understanding their meaning. The pain Isabel has during intercourse has practically destroyed her. Isabel is depressed and afraid her husband will cheat on her. Isabel's mood swings, depression, and sleeping problems are classic signs of posttraumatic stress disorder. Before the surgery, Isabel and her husband had a close relationship, but Ramon questions when Isabel will be better. Ramon is depressed and the children do not know what is wrong.

Isabel feels betrayed by the doctors, whom she trusted. She feels the doctors should be held accountable, but has not sought treatment for her psychological condition. In Dr. Reed's opinion, Isabel is not malingering.

### 3. *Dr. Albert J. Phillips (Defense Expert)*

Dr. Phillips is an obstetrician-gynecologist. Isabel had a history of heavy bleeding, which returned after an estrogen treatment. Dr. Phillips agreed with Dr. Pine that a D&C was a procedure within the standard of care in response to Isabel's bleeding problems. Dr. Phillips was also of the opinion that an exploratory laparoscopy was within the standard of care, because of Isabel's history of pelvic pain and heavy bleeding.

Dr. Phillips's opinion is that a sebaceous hyperplasia causing a painful and indurated mass in the right labia could be surgically excised within the standard of care. He did not see any indication before surgery of a sebaceous hyperplasia. Excision of the mass from Isabel was totally appropriate. The

mass was removed by Dr. Navas in a manner consistent with the standard of care. Isabel had what Dr. Phillips believed was congenital labia asymmetry, in that the left labia was larger than the right labia minora.

Dr. Phillips was able to elicit pain in Isabel during an examination. He opined that Isabel formed a neuroma, which he described as a collection of nerves that incorporated into scar tissue. This occurred because of abnormal healing in the area, not because a procedure was done incorrectly. A neuroma in that area would cause pain during intercourse. The problem could be treated with a steroid injection, or through a procedure to cut out the tissue in hope that the new healing will not incorporate scar tissue or a neuroma.

### 4. *Dr. Barbara Moyer (Defense Psychologist)*

Dr. Moyer holds a Ph.D. in clinical psychology, with a specialty in neuropsychology. Posttraumatic stress disorder is a set of symptoms in response to an extreme and potentially life-threatening trauma. The syndrome is based upon an extreme event which is very much out of the realm of human experience. The reaction of Isabel to her surgery is not the type of experience which would support the syndrome. Isabel did not exhibit the symptoms of posttraumatic stress disorder to rule out malingering. Dr. Moyer was not given an opportunity to personally evaluate Isabel.

### E. *Testimony Regarding Isabel's Prior Treatments*

Dr. Sid Kamrava is a medical doctor who is board certified in obstetrics and gynecology and who treated Isabel beginning in May 1993. Dr. Kamrava saw Isabel as a patient in March and April 1999, when she complained of heavy bleeding. He did a D&C on Isabel in April 1999. She returned to his office on May 3, 1999, with an abscess of the Bartholin's gland, which he drained by making a tiny incision. A needle was used to withdraw fluids two days later from cysts left in the same area. A few weeks later, Isabel returned complaining of pelvic pain. Dr. Kamrava repaired her cystorectolele. He would not have done the procedures had Isabel not understood them.

On August 9, 1999, Isabel complained of swelling and pain on the left side of her genitalia. Dr. Kamrava incised and drained a vulvar abscess on the left side. In February 2000, Isabel complained of pain with urination, discharge, and pelvic pain. She had a vaginal infection with a small ovarian cyst, a small uterine fibroid, and pain.

In April 2002, Isabel complained of heavy bleeding and some vaginal discharge. She did not complain that the pain interfered with sexual relations

with her husband and no tenderness was noted. Dr. Kamrava did not notice anything visually different in her external genitalia.

Dr. Kamrava saw Isabel again on March 12, 2003, at which time she complained of pain during intercourse and discharge. Isabel said they had cut her vulva. Dr. Kamrava's impression was that Isabel felt pain from a retroverted fibric uterus. Her mood was normal. He did not note that the left side of her external genitalia was larger than the right. Seventy percent of women are symmetrical, 30 percent are not.

After Dr. Kamrava was deposed, Isabel complained to him in June 2003 of pain on the right side of her genital area. The right labia had scar tissue tender to the patient and the lower part of her right labia minora was missing. Isabel's right labia was tender to palpation.

## DISCUSSION

## I

## INFORMED CONSENT ISSUES

A. *Dr. Navas's argument that Isabel signed a consent form detailing the procedures to be performed, thereby acknowledging her informed consent.*

Dr. Navas argues that Isabel consented to the procedures performed upon her on June 29, 2001, as evidenced by the form she signed. In so arguing, Dr. Navas contends the record shows that Isabel did read Spanish, despite her contrary testimony. Dr. Navas further argues that Dr. Dunkelman and Dr. Navas verbally advised Isabel of the intended procedures, thereby constituting verbal informed consent.

Dr. Navas's argument is based on a view of the evidence impliedly rejected by the jury. While there is evidence in the record, which if believed by the jury would have supported a defense verdict, there also is abundant evidence to the contrary. Under the substantial evidence rule, Dr. Navas's argument that informed consent was given is without merit.

■ "When considering a claim of insufficient evidence on appeal, we do not reweigh the evidence, but rather determine whether, after resolving all conflicts favorably to the prevailing party, and according the prevailing party the benefit of all reasonable inferences, there is substantial evidence to support the judgment." (*Scott v. Pacific Gas & Electric Co.* (1995) 11 Cal.4th 454, 465 [46 Cal.Rptr.2d 427, 904 P.2d 834].) In reviewing the evidence on

appeal, all conflicts must be resolved in favor of the judgment, and all legitimate and reasonable inferences indulged in to uphold the judgment if possible. When a judgment is attacked as being unsupported, the power of the appellate court begins and ends with a determination as to whether there is any substantial evidence, contradicted or uncontradicted, which will support the judgment. When two or more inferences can be reasonably deduced from the facts, the reviewing court is without power to substitute its deductions for those of the trial court. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571 [38 Cal.Rptr.2d 139, 888 P.2d 1268]; *Crawford v. Southern Pacific Co.* (1935) 3 Cal.2d 427, 429 [45 P.2d 183].)

The doctrine of informed consent was explained as follows in *Arato v. Avedon* (1993) 5 Cal.4th 1172, 1182–1183 [23 Cal.Rptr.2d 131, 858 P.2d 598] (*Arato*): "The fount of the doctrine of informed consent in California is our decision of some 20 years ago in *Cobbs v. Grant* [(1972)] 8 Cal.3d 229 [104 Cal.Rptr. 505, 502 P.2d 1] [(*Cobbs*)], an opinion by a unanimous court that built on several out-of-state decisions significantly broadening the scope and character of the physician's duty of disclosure in obtaining the patient's consent to treatment. In *Cobbs* . . . , we not only anchored much of the doctrine of informed consent in a theory of negligence liability, but also laid down four 'postulates' as the foundation on which the physician's duty of disclosure rests.

■ " 'The first [of these postulates,]' we wrote, 'is that patients are generally persons unlearned in the medical sciences and therefore, except in rare cases, courts may safely assume the knowledge of patient and physician are not in parity. ■ The second is that a person of adult years and in sound mind has the right, in the exercise of control over his own body, to determine whether or not to submit to lawful medical treatment.' [Citation.]

■ " 'The third [postulate,]' we continued, 'is that the patient's consent to treatment, to be effective, must be an informed consent. ■ And the fourth is that the patient, being unlearned in medical sciences, has an abject dependence upon and trust in his physician for the information upon which he relies during the decisional process, thus raising an obligation in the physician that transcends arms-length transactions.' [Citation.] ■ From these ethical imperatives, we derived the obligation of a treating physician 'of reasonable disclosure of the available choices with respect to proposed therapy and of the dangers inherently and potentially involved in each.' " (Fn. omitted.)

The record, viewed in the light most favorable to the judgment, supports a finding that Dr. Navas and Dr. Dunkelman did not satisfy their obligation " 'of reasonable disclosure of the available choices with respect to proposed

therapy and of the dangers inherently and potentially involved in each.' " (*Arato, supra,* 5 Cal.4th at p. 1183.) Isabel testified she was only told by Dr. Dunkelman about the D&C, but not about the laparoscopy or removal of a lesion. She further testified she never met Dr. Navas prior to the surgery, and he did not discuss the procedures with her. Isabel testified she was given Spanish-language forms to initial and sign, but she did not read Spanish and the forms were not interpreted for her. Isabel testified to her shock when she saw stitches after the procedures. There is no indication in the record that Isabel was advised of possible disfigurement, excessive long-term pain, or interference with her ability to have pain-free sexual intercourse. The jury's determination of a lack of informed consent is supported by substantial evidence.

B. *The existence of a signed consent form as conclusive proof of informed consent.*

Dr. Navas and Cedars Towers contend that a signed consent form constitutes conclusive proof of informed consent. Relying largely on contract principles, it is argued that one who signs an instrument (such as the consent form in the instant case) is bound by its terms. Cedars Towers argues that Isabel's uncorroborated testimony is insufficient to overcome the presumed validity of the written consent. Cedars Towers further argues that if a signed consent form is not given conclusive force, "plaintiffs will undoubtedly and routinely deny that they read or understood consent forms they signed in order to pursue lawsuits against their doctors" and "the effect of disregarding the consent form would have significant impact on the practice of medicine."

The law is clear in California that the existence of informed consent is an issue of fact for the jury. The question has been described as "a peculiarly fact-bound assessment which juries are especially well-suited to make." (*Arato, supra,* 5 Cal.4th at p. 1186.) In administering the doctrine of informed consent, " 'each patient presents a separate problem, . . . the patient's mental and emotional condition is important and in certain cases may be crucial, and . . . in discussing the element of risk a certain amount of discretion must be employed consistent with the full disclosure of facts necessary to an informed consent.' " (*Id.* at p. 1185.) It is the physician's duty " 'to disclose to the patient all material information to enable the patient to make an informed decision regarding the proposed *operation* or *treatment.* [¶] Material information is information which the physician knows or should know would be regarded as significant by a reasonable person in the patient's position when deciding to accept or reject a recommended *medical procedure.* . . .' " (*Id.* at p. 1188, fn. 9.)

Plaintiffs' evidence in the instant case demonstrates why a signed consent is not entitled to conclusive proof of informed consent. As discussed above,

Isabel presented evidence that the procedures performed upon her by Dr. Navas went beyond that discussed with Dr. Dunkelman, Dr. Navas never met with her before the surgery, she could not read the Spanish-language consent form, and she was effectively told to "sign here" and "initial there." The Spanish-language form was not translated into English at trial, making it impossible to determine if the form satisfies the requirements of *Cobbs*.

Defendants' reliance on *Danielson v. Roche* (1952) 109 Cal.App.2d 832 [241 P.2d 1028] (*Danielson*) is misplaced. In *Danielson*, a physician diagnosed his patient as having appendicitis and salpingitis, and advised an immediate operation. The patient signed a form authorizing and consenting to the performance of " 'all and singular any treatments or operation to or upon me which may now or during the contemplated services be deemed advisable or necessary.' " (*Id.* at p. 833.) During the surgery, the physician found infected fallopian tubes, which the surgeon removed. In the patient's medical malpractice action for removing her fallopian tubes without her consent, the jury returned a verdict for the physician. "Such consent, or lack thereof, was thus tendered as one of the issues—and an important one—for the jury" (*id.* at p. 835), and "[t]he jury apparently treated the consent as embracing not only the appendectomy but whatever further operation might be considered necessary after the abdomen had been opened up and explored by the surgeon. . . . The verdict implies a finding that the consent included the operation in both its phases." (*Ibid.*) The decision in *Danielson* demonstrates that the adequacy of a written consent is a factual issue for the jury, and does not stand for the proposition that a signed form is conclusive proof that informed consent was given.

It is argued that Evidence Code section 622[8] renders recitals in the written consent signed by Isabel conclusively binding as to the issue of informed consent. Evidence Code section 622, formerly found in Code of Civil Procedure section 1962, subdivision 2, "codifies the common law doctrine of 'estoppel by contract.' " (*Plaza Freeway Ltd. Partnership v. First Mountain Bank* (2000) 81 Cal.App.4th 616, 625–626 [96 Cal.Rptr.2d 865], quoting *Estate of Wilson* (1976) 64 Cal.App.3d 786, 801 [134 Cal.Rptr. 749].) Assuming that Evidence Code section 622 applies to a written medical consent form, the statute provides no relief to defendants because the Spanish language consent form was never translated into English at trial. In the absence of a proper translation of the document, we simply have no way of knowing the content of any recitals in the consent form or whether the form constitutes an instrument within the meaning of the Evidence Code section

---

[8] Evidence Code section 622 provides as follows: "The facts recited in a written instrument are conclusively presumed to be true as between the parties thereto, or their successors in interest; but this rule does not apply to the recital of a consideration."

622. Given the state of the record on appeal, we cannot conclude that Evidence Code section 622 provides a basis for reversal of the judgment.

██ In any event, there is no authority to support the argument that Evidence Code section 622 applies in the context of informed consent.[9] Cedars Towers concedes "the word 'instrument,' as used in section 622, usually refers to a contract." While Evidence Code section 622 has been applied to documents other than contracts, such as a transfer of property (*Estate of Wilson, supra,* 64 Cal.App.3d at p. 801) and an estoppel certificate (*Plaza Freeway Ltd. Partnership v. First Mountain Bank, supra,* 81 Cal.App.4th at pp. 628–629), the argument that recitals in an instrument conclusively establish informed consent is inconsistent with the rationale supporting the informed consent doctrine. The law of informed consent has "helped effect a revolution in attitudes among patients and physicians alike regarding the desirability of frank and open disclosure of relevant medical information." (*Arato, supra,* 5 Cal.4th at pp. 1184–1185.) Application of the conclusive presumption of Evidence Code section 622 to recitals in a waiver form would not foster the purposes behind the informed consent rule. Where, as here, there is substantial evidence that the patient was rushed through the admission process without a real opportunity to read the consent form, she was not able to read the language on the form, and she did not understand what procedures were going to performed upon her, we conclude that the conclusive presumption of Evidence Code section 622 is inapplicable.

Cedars Towers also argues that Isabel's uncorroborated testimony is insufficient to overcome the validity of a signed, written consent. The jury was properly instructed pursuant to BAJI No. 2.01 that "[t]he testimony of one witness worthy of belief is sufficient to prove any fact." BAJI No. 2.01 is a correct statement of law. (Evid. Code, § 411 ["Except where additional evidence is required by statute, the direct evidence of one witness who is entitled to full credit is sufficient for proof of any fact"].)

██ Cedars Towers further argues that studies show that allowing a patient to rebut the validity of a written consent would expose doctors to frivolous lawsuits, and if a patient's signed, written consent is not enforced, doctors will be exposed to unlimited liability on informed consent theories. Sound policy reasons support a rule allowing a patient to rebut a signed consent where, as here, a legitimate dispute exists between Isabel and defendants as

---

[9] The authorities relied upon by Dr. Navas and Cedars Towers in support of the argument that exhibit 9 constitutes conclusive proof of consent are inapposite. For example, *Bolanos v. Khalatian* (1991) 231 Cal.App.3d 1586 [283 Cal.Rptr. 209], involved the enforceability of an arbitration agreement in a medical malpractice case. *Estate of Wilson, supra,* 64 Cal.App.3d 786, construed documents in a probate proceeding. Neither case involved proof of informed consent.

to whether: she was ever told of all the procedures performed; she met the doctor who operated on her prior to the operation; the document was explained to her since she did not read Spanish; and the record contains no verbatim translation of the written consent. In accordance with *Cobbs, supra,* 8 Cal.3d at pages 244–245, *Arato, supra,* 5 Cal.4th at pages 1185–1186, and *Danielson, supra,* 109 Cal.App.2d at page 835, we hold that the validity of written consent in the instant case was a question of fact for the jury to decide based upon conflicting evidence.

C. *Dr. Dunkelman's contention that a physician who examines a patient cannot be held liable for the treating physician's subsequent failure to obtain informed consent.*

Dr. Dunkelman argues that he cannot be held responsible for Dr. Navas's failure to obtain Isabel's informed consent, because he neither treated nor operated on Isabel. Dr. Dunkelman cites *Daum v. SpineCare Medical Group, Inc.* (1997) 52 Cal.App.4th 1285 [61 Cal.Rptr.2d 260] (*Daum*) in support of his argument that a referring physician is not liable for the treating physician's failure to obtain informed consent, although Dr. Dunkelman realizes the limited scope of *Daum* since it involved a statute pertaining to experimental devices, an issue not present in the instant case. We conclude, under the facts in this case, that Dr. Dunkelman was responsible for obtaining Isabel's informed consent if Dr. Navas did not do so, and the failure of both physicians to fulfill their obligation rendered each liable.

In *Daum,* a patient with recurring back problems received a surgically implanted experimental device. Before the surgery, the patient was seen by an internist involved in the nonsurgical portion of the patient's treatment, and also by another physician, who was the designated investigator of the experimental device. In an action alleging lack of informed consent that the device implanted in the patient was experimental, the trial court granted nonsuit in favor of the internist. The judgment granting nonsuit was affirmed on the basis that under federal law the designated investigator was responsible for disclosing the experimental nature of the device, but the duty to disclose did not extend to the internist under the relevant federal laws. (*Daum, supra,* 52 Cal.App.4th at pp. 1318–1319.)

Unlike the situation in *Daum,* there is no federal statute or other rule of law in the instant case allocating the obligation to obtain Isabel's informed consent solely to Dr. Navas. Viewing the evidence in the light most favorable to the judgment, the role of Dr. Dunkelman was more than merely that of a referring physician. Dr. Dunkelman owned all of the stock in Cedars Towers, and Dr. Navas was employed by Cedars Towers. Dr. Dunkelman was the physician who met with Isabel, made the diagnosis, and discussed treatment

with her. Dr. Dunkelman informed Dr. Navas in a phone conversation what procedures Dr. Navas was to perform on Isabel. Isabel was not aware Dr. Navas would perform the surgery, believing instead that Dr. Dunkelman was going to be the surgeon. According to Isabel, she did not meet Dr. Navas before being put under anesthesia and was not examined by him.

Given this factual record, the jury could reasonably conclude that Dr. Dunkelman shared responsibility for obtaining informed consent from Isabel. The issue was fairly presented to the jury through BAJI No. 3.77 ("When negligent or wrongful conduct of two or more persons or negligent or wrongful conduct and natural causes contribute concurrently as a cause of injury, the conduct of each is a cause of the injury regardless of the extent to which each contributes to the injury"). Isabel's informed consent could have been obtained by Dr. Dunkelman or Dr. Navas, either of which would have been legally sufficient. Because the record supports a finding that both doctors failed to obtain Isabel's informed consent, the jury reasonably allocated fault to both Drs. Navas and Dunkelman.

## II–XIV[*]

. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .

## DISPOSITION

The judgment finding Drs. Dunkelman and Navas liable for negligence as to plaintiff Isabel Quintanilla and liable for loss of consortium to plaintiff Ramon Quintanilla is affirmed. The judgment fixing total liability between Dr. Dunkelman and Dr. Navas at $250,000 in favor of plaintiff Isabel Quintanilla and $60,000 in favor of plaintiff Ramon Quintanilla is affirmed. The judgment is reversed to the extent it apportions damages between Dr. Dunkelman, Dr. Navas, and Cedars Towers. The judgment finding Cedars Towers negligent as to Isabel Quintanilla and liable for loss of consortium to Ramon Quintanilla is reversed. The trial court is to conduct further proceedings consistent with this opinion to determine the division of fault for negligence and loss of consortium between Dr. Dunkelman and Dr. Navas, and the responsibility, if any, of Cedars Towers for the conduct of

---

[*]See footnote, *ante*, page 95.

Dr. Dunkelman and Dr. Navas. All orders granting and denying costs and prejudgment interest are reversed without prejudice to reconsideration once the underlying lawsuit is resolved on the merits. Plaintiffs' motion for sanctions for filing a frivolous appeal is denied. The parties are to bear their own costs on appeal.

Turner, P. J., and Mosk, J., concurred.

The petition of defendants and appellants for review by the Supreme Court was denied December 21, 2005, S137923.