Filed 11/23/22  In re Z.V. CA4/1

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

COURT OF APPEAL, FOURTH APPELLATE DISTRICT

DIVISION ONE

STATE OF CALIFORNIA


| | |
|---|---|
| In re Z.V., a Person Coming Under the Juvenile Court Law. | |
| SAN DIEGO COUNTY HEALTH AND HUMAN SERVICES AGENCY, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> K.V. et al., <br><br> Defendants and Appellants. | D080618 <br><br> (Super. Ct. No. NJ15795) |


APPEALS from an order of the Superior Court of San Diego County, Michael J. Imhoff, Commissioner.  Affirmed.

Kevin Lemieux, for Defendant and Appellant, K.V.

John P. McCurley, for Defendant and Appellant, R.V.

Claudia G. Silva, County Counsel, Caitlin E. Rae, Chief Deputy County Counsel, and Kristen M. Ojeil, Deputy County Counsel, for Plaintiff and Respondent.

R.V. (Father) and K.V. (Mother) (together, the parents), appeal the juvenile court's jurisdictional findings and related order declaring Z.V. a dependent of the juvenile court under Welfare and Institutions Code section 300, subdivision (a).[1]  They contend that the juvenile court's findings are not supported by substantial evidence.  We disagree and affirm the order.

## I.   FACTUAL AND PROCEDURAL BACKGROUND

### A.   *Z.V.'s Hospitalization*

In November 2021, Mother and Father had been married for two years and had one child together, then three-month-old Z.V.  On November 12, 2021, at around 12:15 a.m., Father woke Z.V. for a routine feeding after Mother went to sleep.  After the feeding, Z.V. started screaming and squirming in Father's arms.  Father reported that he attempted to calm Z.V. by patting her back, and Z.V. bumped her head on Father's head several times.

Father paced with Z.V. as she screamed, and Mother called out to ask if Father needed help because he appeared to be panicking.  Z.V. turned blue and appeared to lose consciousness as she stopped crying.  Father yelled at Mother to call 911 because he believed Z.V. was not breathing.

Dispatch advised the parents to do CPR while paramedics were on their way to their home.  While Father performed CPR, Z.V. vomited and started crying.  When the paramedics arrived, they observed Z.V. to be ashen and limp.  The paramedics gave Z.V. oxygen and transported her to the hospital in an ambulance.

When Z.V. arrived at the hospital, she was treated by Dr. Lukas Austin-Page.  Father arrived at the trauma bay during Dr. Austin-Page's

---

[1]   All further unspecified statutory references are to the Welfare and Institutions Code.

initial assessment of Z.V. Mother appeared upset and angry and did not acknowledge Father's arrival. While Father discussed the events leading to Z.V.'s unresponsive episode, Mother asked Father, "why would you be shaking her?" Father denied shaking Z.V. and said Z.V.'s body was jerking during her feeding. It was unclear to Dr. Austin-Page whether Mother was making an accusation that Father shook Z.V., or she misunderstood the history provided by Father.

That morning, Z.V.'s treatment team performed several tests on Z.V., including a CT scan.[2] The CT scan showed the presence of a subdural hematoma in the left frontal region of Z.V.'s head. A subdural hematoma is a collection of blood under the skull and outside of the brain, in the subarachnoid space.

Based on the presence of the subdural hematoma and the dynamics Dr. Austin-Page observed between the parents, Dr. Austin-Page was concerned for possible non-accidental trauma inflicted upon Z.V. Given these findings, a trauma evaluation was ordered and Z.V. was admitted to the pediatric intensive care unit (PICU). The child protection team recommended additional testing and a social work consultation in order to file a report with child welfare services for suspected child abuse.

Social worker Stephanie Jones conducted a social work child protection assessment. When she entered the hospital room to interview the parents, Jones noted that Father showed very little emotion but stated "we're very concerned" several times. Mother was crying prior to the social worker

---

[2]     " 'CT scan' stands for 'computerized tomography,' a radiological diagnostic technique which allows very detailed study of body parts and injuries." (*Townsend v. Turk* (1990) 218 Cal.App.3d 278, 281, fn. 3.)

entering the room, and Mother explained that she had a history of anxiety and depression.

Social worker Lloydecia Moore interviewed Father and he described the events leading to Z.V.'s hospitalization. Father reported that, during the evening prior to Z.V.'s hospitalization, the family went to a local pizza restaurant for dinner. During dinner, Mother attempted to pass Z.V. to Father and Z.V. slipped from Mother's arms. Father caught Z.V. and Z.V.'s head moved backwards. Father was unsure if Z.V. bumped her head on the restaurant table. Father also provided several scenarios he believed may have been responsible for the subdural hematoma, including bouncing Z.V. on a "bouncer" to help her calm, Z.V. hitting her head on Father's head during the incident leading to her hospitalization, and a car accident that occurred a week prior.

Z.V.'s medical team performed additional testing throughout the day. Dr. Preeti Bansal was consulted to determine whether retinal hemorrhaging was present. Dr. Bansal determined that there was no retinal hemorrhaging and Z.V. had normal ocular structure and function. Dr. Brian Pugmire completed a CT scan of Z.V.'s pelvic area. The CT scan revealed what was initially believed to be a six-millimeter laceration in Z.V.'s liver.

According to Z.V.'s medical records, an "MRI without contrast"[3] was also performed, which confirmed the presence of a subdural hematoma and indicated that "[t]hrombosed convexity veins [were] not excluded." Multiple members of Z.V.'s medical team treated the abnormality observed in her imaging as a subdural hematoma throughout the course of her treatment in

---

[3]    An MRI is testing using magnetic resonance imaging. (*People v. Banks* (2014) 59 Cal.4th 1113, 1136, disapproved on another ground in *People v. Scott* (2015) 61 Cal.4th 363, 391, fn. 3.)

the PICU, including Dr. Parltosh Khanna, Dr. Justin Hamrick, Dr. Elise Becker, Dr. Nicholas Saenz, Dr. Raveen Raviendran, Dr. Michael Levy, and Dr. Austin-Page.

Dr. Shalon Nienow, an attending physician at the hospital to which Z.V. was admitted, performed a child abuse assessment of Z.V. at the request of Z.V.'s treatment team. As part of her assessment, Dr. Nienow reviewed Z.V.'s medical records and spoke with Z.V.'s treatment team, social workers, and parents. Dr. Nienow opined to the social worker that the neurological symptoms exhibited by Z.V. and the subdural hematoma were caused by the same incident. Dr. Nienow further reported that the liver laceration was " 'significant for inter-abdominal trauma from a hit or squeezing.' "

During her interview with Mother, Dr. Nienow received additional information about Father's handling of Z.V. and the relational dynamics between the parents. Mother told Dr. Nienow that Father gets frustrated with Z.V. and uses force that seems violent to Mother. Mother reported that Father picks up Z.V. really fast which causes her head to flop back. Mother also reported that Father violently swaddles Z.V. and slams her down on the changing table. Mother said that Father gets angry with Z.V. and he handles Z.V. in a way that makes Mother uncomfortable. Mother stated that during the evening of Z.V.'s hospitalization and prior to the onset of Z.V.'s symptoms, Z.V. was screaming and Father was frustrated and raising his voice at Z.V.

5

Mother expressed that she was fearful Father would be mad at her because she disclosed her concerns about Father's handling of Z.V.[4]

In her assessment, Dr. Nienow concluded that the subdural hematoma was the result of either high force impact trauma or repeated acceleration or deceleration of Z.V.'s head. Dr. Nienow further concluded that the subdural hematoma and Z.V.'s neurological symptoms were related, and the trauma that precipitated these conditions would have occurred immediately prior to the onset of the symptoms. Dr. Nienow concluded that the liver laceration was the result of either high force impact to Z.V.'s abdomen or an extreme pressure event. Because the parents did not provide a history that would account for these injuries, Dr. Nienow concluded that the injuries were indicative of abusive head trauma.

On November 13, 2021, Z.V. was discharged from the hospital and released to her paternal grandfather. The grandparents agreed to care for Z.V. in the parents' home, and the parents agreed to leave the home until the detention hearing on November 19, 2021. The Agency's safety plan required that the parents could not be with Z.V. unless supervised by the grandparents.

B.    *Initial Dependency Proceedings*

On November 18, 2021, the Agency filed a juvenile dependency petition alleging that Z.V. was a child within the jurisdiction of the juvenile court pursuant to section 300. The petition alleged that Z.V. suffered, or was at

---

[4]    In a follow-up appointment on December 1, 2021, Mother asked to "redo" the questions originally posed by Dr. Nienow. Mother stated that in her initial interview, she " 'made statements she didn't mean.' " Mother's attempted retraction of her original statements regarding Father's handling of Z.V. caused Dr. Nienow concern that the family was unwilling to recognize Z.V.'s injuries were indicative of physical abuse.

substantial risk of suffering, serious physical harm inflicted non-accidentally by Z.V.'s parents. Specifically, the petition alleged that Z.V. suffered detrimental and traumatic conditions, including an acute subdural hematoma and liver laceration. The petition further alleged that the traumatic condition would not ordinarily be sustained except as a result of the unreasonable acts of the child's parents, pursuant to section 355.1.

On November 19, 2021, the court conducted a detention hearing pursuant to section 319. The court found that the Agency made a prima facie showing that Z.V. was a person described in section 300, subdivision (a). The court removed custody of Z.V. from Father pursuant to section 319, subdivision (c), on the basis that there was a substantial danger to the physical and emotional health of Z.V. The court detained Z.V. in the custody of Mother on the condition that Father vacate the family home. However, Father was permitted to have "liberal supervised visits" with Z.V. on the condition that one of the grandparents was present during the visitation.

On December 14, 2021, the Agency filed an amended petition alleging a second count pursuant to section 300, subdivision (a). Count 2 alleged Father subjected Z.V. to serious physical harm, including an acute subdural hematoma and liver laceration. Count 2 further stated, "[a] medical child abuse expert has opined that the child suffered non-accidental abusive head trauma and more likely than not physical abuse."

On December 15, 2021, the court conducted a detention hearing pursuant to section 319 to address the amended petition. The court again found that the Agency had made a prima facie showing that Z.V. was a person described in section 300, subdivision (a) as to count 2. The court maintained its prior orders relating to Z.V.'s custody and clarified that Father was permitted to work from the family home during the week.

7

In an addendum report filed on February 8, 2022, Dr. Nienow provided an update regarding the purported liver laceration observed in Z.V.'s initial CT scan. Dr. Nienow reported that, after peer review and further testing, the liver abnormality was determined to be a hemangioma and not a laceration resulting from physical abuse. However, Dr. Nienow confirmed her initial diagnosis of abusive head trauma based on the presence of the subdural hematoma.

C.    *Jurisdiction and Disposition Hearing*

The jurisdiction and disposition hearing took place over the course of five days, beginning on March 24, 2022. Prior to the start of the hearing, the Agency moved to dismiss count 1, and moved to amend count 2 to strike the language referencing a liver laceration. The juvenile court granted the motion without objection. The Agency then moved into evidence the detention report dated November 19, 2021, the jurisdiction and disposition report dated December 9, 2021, the detention report dated December 15, 2021, and three addendum reports dated January 4, 2022, February 8, 2022, and March 24, 2022. The court admitted the reports into evidence without objection, and the Agency presented no further evidence.

Karli Cox, the social worker assigned to Z.V.'s case since November 23, 2021, was the first witness to testify. Cox testified Father had been cooperative and responsive during her involvement on the case, and Father had no criminal or arrest history. She further noted the parents had good family support and there had been no prior issues relating to Z.V. However, Cox explained she had concerns regarding the relational dynamic between the parents, including Mother's fear that Father would learn of the statements she provided to Dr. Nienow.

8

Cox discussed a letter she received from Dr. Thomas Grogan, a medical expert retained by the parents. In his letter, Dr. Grogan stated that he reviewed Z.V.'s medical records and opined that Z.V.'s subdural hematoma was small and would have healed uneventfully even if left untreated. Dr. Grogan did not believe that the subdural hematoma was caused by rapid acceleration or deceleration, noting the absence of injuries to Z.V.'s eyes. Dr. Grogan's letter concluded that the cause of the subdural hematoma was unknown and did not appear to be related to the unresponsive episode that preceded Z.V.'s hospitalization.

According to Cox, Dr. Grogan's opinion did not change her assessment and conclusion regarding the risk of physical abuse. She explained that Dr. Grogan's letter did not change her conclusion because, according to Dr. Grogan, most subdural hematomas are caused by a baby "dropping and falling" on their head, and there was no history provided by the parents that described such an incident. Cox testified that the combination of Mother's statements describing Father's forceful handling of Z.V., and the absence of a history that explained Z.V.'s injuries, justified the Agency's concern for child abuse. She accepted Dr. Nienow's conclusions as the child abuse expert assigned to Z.V.'s case and did not consider opinions by anyone not associated with the hospital to which Z.V. was admitted.

Father then testified and described the events leading to Z.V.'s hospitalization. Father introduced into evidence a short "nanny cam" video of Father picking up Z.V. from her crib during the feeding that preceded her hospitalization. Father testified the nanny cam video depicted the "normal way" he wakes Z.V. up. Father testified that he did not shake or drop Z.V., and he did not do anything to harm Z.V. intentionally.

9

Father also described a car accident that occurred between 11 and 12 days before Z.V.'s hospitalization. During the car accident, Mother and Z.V. were in the back seat of the family car, which was rear-ended by a large truck. Z.V. was seated in her car seat but she may not have been properly restrained.

Father then called Dr. Grogan, an orthopedic surgeon, to testify. Dr. Grogan reviewed Z.V.'s medical records and related reports from the hospital to which Z.V. was admitted. Dr. Grogan concluded that Z.V.'s imaging revealed a subdural hematoma. Dr. Grogan opined that a subdural hematoma the size observed in Z.V. would be reabsorbed within seven to ten days.

Dr. Grogan testified that he disagreed with Dr. Nienow that the subdural hematoma was likely caused by rapid acceleration or deceleration. Dr. Grogan opined that the most likely scenario to cause an injury like the subdural hematoma observed in Z.V. was an incident in which Z.V. was dropped, head-first, with enough force to cause a concussive event but not a fracture. Dr. Grogan concluded that the subdural hematoma was likely not the cause of the unresponsive period preceding Z.V.'s hospitalization because he would expect the hematoma to have a larger amount of hemorrhage.

Dr. Grogan opined that the vehicle accident described by Father was likely not the cause of the subdural hematoma because a bleed that occurred 12 days prior to the CT scan would likely include layering of blood. Dr. Grogan also testified that the subdural hematoma was likely not caused by Z.V. hitting her head on the table at the pizza restaurant the evening before her hospitalization, because there was no indentation to the scalp or swelling underneath the scalp. Ultimately, Dr. Grogan could not state the

exact etiology of the subdural hematoma for certain, and he could not rule out an intentional act by the parents as the cause of the injury.

Dr. Nienow testified for over two days of the jurisdictional hearing. Dr. Nienow described her qualifications and expertise, explaining she is a subspecialist who helps to determine whether child abuse or neglect is present in a given case. Dr. Nienow explained the process of her assessment of Z.V., which included an interview with the parents and a review of Z.V.'s medical records and related reports. Dr. Nienow described the imaging done on Z.V.'s head when she arrived at the hospital as a "head CT followed by a brain MRI." Dr. Nienow asserted Z.V.'s MRI was done "with and without" contrast.

Dr. Nienow acknowledged that the abnormality observed in Z.V.'s liver was a hemangioma and not a laceration, as initially reported. Dr. Nienow explained that she had relied on the radiologist's diagnosis of the liver laceration, who reviewed the CT scan of the liver and interpreted the finding. Dr. Nienow is not a radiologist and cannot read abdominal CT scans. Dr. Nienow explained that, after peer review and further testing, multiple radiologists determined that the finding was not a laceration, at which point Dr. Nienow informed the parents that there was no injury to Z.V.'s liver.

Dr. Nienow was also questioned about the absence of retinal hemorrhaging in Z.V.'s case. Dr. Nienow testified that studies documenting retinal hemorrhaging in abusive head trauma cases vary, but, on average, studies indicate that 60 to 80 percent of abusive head trauma causes do not include retinal hemorrhaging. Dr. Nienow discussed a statistic from a scholarly article stating that retinal hemorrhaging is present in approximately 85 percent of abusive head trauma cases. Although Dr. Nienow stated the article was written by authors she respected, she

11

disagreed with their statements that retinal hemorrhaging occurred in 85 percent of abusive head trauma cases.

Dr. Nienow also discussed the exclusion of venous thrombosis as a potential diagnosis. Dr. Nienow testified that she looked for venous thrombosis when she analyzed the MRI, and thrombosis was not present in Z.V.'s case. Dr. Nienow stated that while underlying medical conditions can cause venous thrombosis, she typically sees the condition in relation to a traumatic brain injury.

When asked whether the proper way to look for venous thrombosis is through magnetic resonance venography ("MRV") rather than an MRI, Dr. Nienow testified that an MRV is part of an MRI. Dr. Nienow asserted that an MRV can be conducted separately as an independent study to look at the vasculature, "[b]ut as part of the brain MRI there is also a construction of the vasculature, looked directly at the vasculature in the course of that entire brain MRI." She further explained that although venous thrombosis was not initially excluded after Z.V.'s CT scan, it was definitively excluded when the MRI was done because there was no thrombosed vein present in the MRI.

According to Dr. Nienow, child abuse is a diagnosis of exclusion, appropriately diagnosed after ruling out alternative histories that could account for an injury. Dr. Nienow opined that the car accident described by Father, and the incident at the pizza restaurant prior to Z.V.'s hospitalization, would not have caused the subdural hematoma. Dr. Nienow concluded Z.V.'s subdural hematoma was more likely than not caused by non-accidental abusive head trauma because there was no other explanation to provide for the injury and neurological decompensation.

Father called a pediatric neuroradiologist, Dr. Lisa Hutchison, to testify. At the time of her testimony, Dr. Hutchison had been a pediatric

12

radiologist for 25 years and typically reviewed 12,000 to 20,000 imaging studies per year. Dr. Hutchison reviewed Z.V.'s medical records relating to her hospitalization, including the imaging reports and studies.

According to Dr. Hutchison, venous thrombosis was never assessed by the imaging studies done to Z.V. Dr. Hutchinson testified that an MRI includes only a superficial look at the veins and an MRV is not included within an MRI. Whenever an infant presents with a small amount of blood over the convexity of the brain, an MRV is the "gold standard" of testing to rule out venous thrombosis. This is because, in order to determine if the blood that appears on an MRI is a blood clot or a subdural hematoma, an MRV is necessary. Because an MRV was not done in Z.V.'s case, Dr. Hutchinson believed that venous thrombosis could not be ruled out.

Dr. Hutchinson explained that venous thrombosis can mimic a subdural hematoma, or alternatively, be caused by a subdural hematoma. There are also rare instances in which minor head trauma can cause hemorrhaging in individuals with venous thrombosis. Venous thrombosis can include symptoms such as seizures and altered mental states, particularly in infants. In some cases, a medical team cannot figure out the cause of venous thrombosis.

Dr. Hutchinson opined that, in Z.V.'s case, the results of the MRI indicated either a subdural hematoma, venous thrombosis, or both. Based on the imaging done in Z.V.'s case, it was not possible to determine whether Z.V.'s injury was caused by rapid acceleration or deceleration, as diagnosed by Dr. Nienow. According to Dr. Hutchinson, if venous thrombosis was present in Z.V., with no other symptoms, physical abuse could be ruled out.

D. *Juvenile Court's Ruling*

At the conclusion of evidence, the juvenile court made credibility findings for each witness. The juvenile court found that Dr. Grogan and Dr. Nienow were both persuasive and competent on the issue of subdural hematomas. The juvenile court discussed Dr. Hutchinson's testimony and found she was well qualified and testified "straightforwardly." However, the juvenile court also noted the limitations of Dr. Hutchinson's testimony because she "reviewed only the medical records and didn't have the ancillary information that [was] before the court." The court discussed social worker Cox's testimony and found no evidence she was "anything other than professional, thorough and straightforward." Finally, the juvenile court noted that the members of Z.V.'s medical team, who treated Z.V. and authored the reports that were admitted into evidence, were "really dedicated to trying to find out, first, what was wrong with [Z.V.] and second, how to help her through it."

The juvenile court also discussed the issue of venous thrombosis and the failure to conduct an MRV. The juvenile court noted that while Dr. Hutchinson did opine that the MRV was the "gold standard" of testing, she did not "indicate a criticism" of Z.V.'s treatment team for failing to conduct an independent MRV. The juvenile court concluded that the evidence demonstrated Z.V.'s medical team would have ordered an MRV if it was necessary to Z.V.'s diagnosis and treatment, and the failure to order an MRV was not "crucial" to the court's assessment.

Ultimately, after considering the entirety of the record, the juvenile court found that Z.V. sustained a subdural hematoma, the subdural hematoma was an inflicted injury caused by a parent, and the injury was serious and not minor. The court further found that the dynamics between

14

the parents indicated a current risk of harm to Z.V.  In making its finding, the juvenile court stated:  "[W]hen the Court is confronted with two possible choices for the subdural hematoma, that being accidental or intentional, and all reasonably proffered explanations and scenarios for the accidental infliction had been considered . . . by competent individuals and rejected, the Court is left with the only conclusion of the inflicted."  Thus, the court made a true finding on count 2 of the amended petition, by a preponderance of the evidence, and concluded Z.V. was a person described in section 300, subdivision (a).

The juvenile court then restored physical custody of Z.V. with both parents and imposed three conditions.  The first condition required the grandparents to "check in on a daily basis with the parents and view [Z.V.]" either in person or virtually.  The second condition required the parents to permit entry into their home by Z.V.'s social worker and counsel during reasonable hours.  The last condition required the parents to continue to engage and show progress in the services offered to them by the Agency.

## II.   DISCUSSION

Father contends that there is no substantial evidence to support the jurisdictional order for Z.V. under section 300, subdivision (a).  Father asserts that the juvenile court's jurisdictional findings were inextricably tied to Dr. Nienow's opinion, and Dr. Nienow's opinion was not supported by substantial evidence.  This is because, according to Father, Dr. Nienow employed a diagnosis of exclusion, but failed to rule out venous thrombosis as

a reasonably possible diagnosis that did not involve the infliction of a non-accidental serious injury.[5]  We disagree with this contention.

A.  *Legal Principles*

The purpose of the statutory scheme governing dependency proceedings is to protect abused or neglected children, or those children at substantial risk of such harm.  (§ 300.2; *In re Kaylee H.* (2012) 205 Cal.App.4th 92, 109.)  Section 300, subdivision (a), provides the juvenile court with jurisdiction over a child when, "[t]he child has suffered, or there is a substantial risk that the child will suffer, serious physical harm inflicted nonaccidentally upon the child by the child's parent or guardian."  To find that a child falls within the description of section 300, subdivision (a), the juvenile court must find the allegations of harm true by a preponderance of the evidence.  (§ 355.)

On appeal, we review the record for substantial evidence to support the juvenile court's section 300 jurisdictional findings.  (*In re Isabella F.*, (2014) 226 Cal.App.4th 128, 137.)  In determining whether substantial evidence supports the juvenile court's findings and orders, " 'we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the

---

5  Respondent contends Father waived his argument that venous thrombosis was not excluded as a reasonably possible diagnosis because Father's counsel stated ". . . there [was] absolutely no factual dispute there was a subdural hematoma."  However, this statement was made within the context of a proffer for Dr. Hutchinson's testimony; this testimony would include the possibility that venous thrombosis was a co-occurring condition that may have caused Z.V.'s subdural hematoma.  Father's expert, Dr. Hutchinson, testified for the express purpose of establishing venous thrombosis as a possible cause of the abnormality in Z.V.'s imaging.  Accordingly, the record does not indicate Father waived this argument.  In any event, the issue before this court is one of substantial evidence and therefore the forfeiture rule is not applicable.  (See *In re R.V.* (2012) 208 Cal.App.4th 837, 848–849.)

court's determinations; and we note that issues of fact and credibility are the province of the trial court.' [Citation.] 'We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court.' " (*In re L.O.* (2021) 67 Cal.App.5th 227, 238.) If a juvenile court's finding is supported by substantial evidence, we must affirm even if other evidence supports a contrary finding. (*In re N.M.* (2011) 197 Cal.App.4th 159, 168.)

B.      *The Juvenile Court's Order is Supported by Substantial Evidence*

In support of his contention that the juvenile court's order was not supported by substantial evidence, Father asserts that the Agency's expert, Dr. Nienow, "failed to rule out the possibility that Z.V.'s bleeding resulted from venous thrombosis rather than abusive head trauma." Father further asserts Dr. Nienow's conclusions were contradicted by the record, noting that she stated an MRI "with contrast" was done, while the medical records reflect that an MRI "without contrast" was done.

Reviewing the entire record and drawing all reasonable inferences in favor of the juvenile court's ruling, we conclude that there is substantial evidence to support its factual findings. Dr. Nienow expressly stated during her testimony that venous thrombosis "was not present." According to Dr. Nienow, she was able to exclude venous thrombosis from a review of the CT scan and the MRI. Thus, the record contains evidence from an expert, whom the juvenile court found to be competent and credible, that venous thrombosis was not present in Z.V.'s case. The testimony of a single witness, if believed by the factfinder, may constitute substantial evidence. (*In re Marriage of Mix* (1975) 14 Cal.3d 604, 614.)

Father relies on *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113 (*Zuckerman*), in support of his argument that Dr. Nienow's

opinions were based on assumptions not supported by the record. In *Zuckerman*, an expert estimated the value of a property by using a comparative property that "include[d] various fixtures, rights, improvements, and personal property which the property being [valued did] not include." (*Id.* at p. 1130.) *Zuckerman* held that, "[w]here an expert bases his conclusion upon assumptions which are not supported by the record, upon matters which are not reasonably relied upon by other experts, or upon factors which are speculative, remote or conjectural, then his conclusion has no evidentiary value." (*Id.* at p. 1135.) The expert's opinion in *Zuckerman* held no evidentiary value because it was based on facts that were not included or supported by the record. (*Id.* at pp. 1135–1136.)

Unlike *Zuckerman*, however, Dr. Nienow reviewed Z.V.'s medical records (which were admitted into evidence) and personally interviewed Z.V.'s parents and social workers. Father's own expert, Dr. Grogan, agreed with Dr. Nienow that the results of the CT scan and MRI revealed a subdural hematoma. Z.V.'s medical records demonstrate that multiple members of Z.V.'s medical team treated her injury as a subdural hematoma. Thus, despite the purported conflict in Dr. Nienow's testimony regarding the imaging performed in Z.V.'s case, the record as a whole supports her conclusion that Z.V. suffered from a subdural hematoma.

As the trier of fact, it was for the juvenile court to resolve any conflict between the expert testimony of Dr. Nienow and Dr. Hutchinson. Dr. Hutchinson disagreed with Dr. Nienow regarding the scope of the testing done and the ability to rule out venous thrombosis based on this testing. According to Dr. Hutchinson, an MRV is not included within MRI testing, as Dr. Nienow testified. In contrast to Dr. Nienow, Dr. Hutchinson opined that

to definitively exclude venous thrombosis in Z.V.'s case an MRV should have been completed.

In performing our substantial evidence review, we cannot substitute our own judgment for the juvenile court's resolution of this conflicting expert testimony. (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 204.) The trier of fact is "free to reject [the] testimony of [either] party's expert, so long as the trier does not do so arbitrarily. [Citation.]" (*People ex rel. Brown v. Tri-Union Seafoods, LLC* (2009) 171 Cal.App.4th 1549, 1568.) Although a trier of fact may not "arbitrarily or unreasonably disregard the testimony of an expert, it is not bound by the expert's opinion. Instead, it must give to each opinion the weight which it finds that opinion deserves." (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 633.)

We conclude that the juvenile court did not act arbitrarily in crediting Dr. Nienow's opinions over Dr. Hutchinson's. While the juvenile court noted that Dr. Hutchinson was exceptionally qualified, it also pointed out that Dr. Hutchinson did not have the benefit of the ancillary information before the court. This ancillary information included the relational dynamics between the parents and Mother's description of Father handling Z.V. violently. And, notably, even Dr. Hutchinson did not opine that venous thrombosis was definitively present in Z.V.'s case. Rather, she testified that Z.V.'s imaging revealed a subdural hematoma, venous thrombosis, or both.

The juvenile court acknowledged Dr. Hutchinson's testimony regarding the limitations of the MRI and noted that an additional "more accurate secondary test" could have been done through the MRV. However, the juvenile court concluded that Z.V.'s treatment team would have ordered the additional testing if it was necessary. And, in weighing the evidence, including Dr. Hutchinson's testimony related to the MRV, the juvenile court

19

stated, "I do not see the fact that the MRV not being ordered is crucial to the Court's assessment." Accordingly, the record demonstrates the juvenile court appropriately weighed the competing opinions of the experts, and the facts upon which the opinions were based.

Moreover, even if the medical evidence alone did not definitively rule out venous thrombosis, we would still find substantial evidence to support the juvenile court's ruling because there was other evidence from which the court could reasonably infer that a non-accidentally inflicted injury was the more probable explanation. Just before the onset of Z.V.'s symptoms, Father was holding Z.V. and caring for her on his own during a nighttime feeding. Z.V. was screaming, and Mother reported that Father was frustrated with Z.V., raised his voice, and appeared to be panicking. At the hospital on the night of the incident, Mother appeared upset and angry and asked Father, "why would you be shaking her?" Mother also reported prior occasions when Father became frustrated with Z.V., raised his voice, violently swaddled Z.V., slammed her on the changing table, and generally used force with which she was uncomfortable. Mother reported that she was hesitant to intervene because Father became upset when she attempted to help with Z.V. Based on these statements, even if the medical evidence by itself did not conclusively rule out venous thrombosis as a hypothetical cause, the trial court could reasonably conclude that Z.V.'s injury was more likely than not a subdural hematoma caused by a non-accidentally inflicted injury.

Considered in its totality, we conclude that the medical testimony combined with the other evidence is sufficient to support the juvenile court's finding by a preponderance of the evidence that the injury was inflicted non-accidentally by a parent. We may not reweigh the evidence or second-guess

the credibility findings made by the juvenile court.  Accordingly, we affirm the juvenile court's order.

## DISPOSITION

The jurisdictional and dispositional order is affirmed.


BUCHANAN, J.

WE CONCUR:


McCONNELL, P. J.


HUFFMAN, J.